659 A.2d 1371

GERARD DOTO AND MARIA DOTO, HIS WIFE, PLAINTIFFS–RESPONDENTS, v. ANTHONY RUSSO AND RUSSO AGENCY, DEFENDANTS–RESPONDENTS, AND UTICA MUTUAL INSURANCE CO., DEFENDANT–APPELLANT.

Argued February 15, 1995—Decided June 29, 1995.

*Robert D. Kretzer* argued the cause for appellant (*Lamb, Hartung, Kretzer, Reinman & DePascale,* attorneys).

*E. Carter Corriston* argued the cause for respondents Gerard Doto, et al. (*Breslin and Breslin,* attorneys; *Mr. Corriston* and *Lawrence Z. Farber,* on the brief).

*James A. Vasios* argued the cause for respondents Anthony Russo, et al. (*Hurley & Vasios,* attorneys; *Mr. Vasios* and *Joanne O. McGovern,* on the brief).

PER CURIAM.

Utica Mutual Insurance Company (Utica) seeks a judgment declaring that it is not obligated under its commercial-umbrella liability policy to provide underinsured motorist (UIM) coverage to its insured. Based on the unique facts present in this case, the trial court found that Utica is so obligated. A divided panel of the Appellate Division affirmed in an unreported opinion. Utica appeals to this Court as of right. *See R.* 2:2–1(a)(2).

I

The facts dictate our resolution of this appeal. The matter arises in the context of cross-motions for summary judgment and all parties agree that no genuine issue of material fact exists. In 1983, Sarasohn & Company (Sarasohn) purchased two insurance

policies from defendant Utica. The policies were obtained through defendant Anthony Russo, a broker with defendant Russo Insurance Agency, Inc. (Russo). One of the policies was an automobile policy providing $750,000 in liability coverage as well as uninsured motorist (UM) and UIM coverage of $500,000 and $1,000,000. The other was a special multi-peril policy with a $4,000,000 limit. When the $4,000,000 multi-peril policy was to be renewed in August 1986, Utica informed Russo that it would not continue to offer that policy. In place of the multi-peril policy, Utica offered to write a primary-liability policy with a $1,000,000 limit and a $3,000,000 commercial-umbrella liability policy. The $3,000,000 umbrella policy would provide expanded coverage beyond the limits set forth in the automobile policy.

Russo presented the policy to Sarasohn, seeking the "approval to go ahead and do it that way." In a letter dated August 26, 1986, Sarasohn authorized Russo to obtain the umbrella policy from Utica. Moreover, Sarasohn confirmed its understanding that the policy would provide $3,000,000 in coverage above the auto-policy coverage.

Utica initially issued the umbrella policy in August 1986. The umbrella policy provided that the insurer shall "pay on behalf of the insured all sums ... [that] the insured shall become legally obligated to pay," for personal injury, property damage, and other specified consequences caused by an occurrence during the policy period. Utica's Underwriting Procedures Manual stated that "[b]ecause the Utica Mutual umbrella policy is such a broad contract, the Company and its reinsurers must be protected with adequate underlying coverages," and therefore the "[u]nderlying insurance for automobile liability ... must be written" by Utica. (Emphasis omitted).

Utica had an umbrella treaty arrangement with General Reinsurance Corporation (General Reinsurance), in which Utica reinsured with General Reinsurance the umbrella policy and "retain[ed] a portion of the premium and coverages and Reinsurance all the rest of it." As the umbrella policy was nearing renewal in

August 1987, General Reinsurance informed Utica senior underwriter Sandra Burleigh on July 22, 1987, that it would not provide UM and UIM coverage in the renewal umbrella policy unless the UM/UIM limits in the underlying auto policy were increased to match the liability limits in the auto policy. At that time, the underlying auto policy contained liability coverage in the amount of $750,000 and UM/UIM coverage of $500,000. The substance of that conversation was confirmed in a subsequent letter from General Reinsurance to Utica dated September 14, 1987, which stated, "It is understood that we will exclude ... UM if the limits are not increased to equal the [automobile liability]."

Pursuant to the "instructions from [the] umbrella carrier [that] specified [that Utica] had to have specific underlying limits on [the] primary policies to meet the underwriting requirements," Burleigh informed Russo in a memorandum dated July 23, 1987, that "to meet the umbrella carrier's requirements, the UM limit must be increased to equal the liability limit. An endorsement has been processed eff[ective] 8/11/87 making this change." In turn, Russo apparently informed Sarasohn of the required $250,000 increase in the limits of the UM/UIM coverage for the underlying automobile policy. Sarasohn accepted the change, and paid an additional premium.

Russo did not "know of any other reason" for raising the limits of UM/UIM coverage in the underlying policy except to provide for UM/UIM coverage in the umbrella policy. Russo understood "that the umbrella policy had requirements on limits of underlying insurance, and the umbrella requirement was now seven hundred fifty thousand for uninsured motorist, in order that uninsured motorist coverage on the excess would be applicable." Russo believed that at the time the UM/UIM policy limits were raised, the umbrella policy included UM and UIM coverage.

When the umbrella policy was renewed in August 1987, Utica had available an endorsement, form 8–UMB–14, that excluded UM and UIM coverage from umbrella policies. That endorsement stated that "the insurance provided by this [umbrella] policy shall

not apply to sums which the Insured shall be legally entitled to recover as damages from the owner or operator of . . . an underinsured automobile because of personal injury sustained by the Insured." Utica's Underwriting Procedures Manual provided: "This endorsement should be used (1) if insured elects not to have uninsured motorists coverage in the umbrella policy or (2) if insured's uninsured motorists limits on the underlying auto policy do not equal the policy's BI limits." Endorsement 8–UMB–14 was not attached to the umbrella policy purchased by Sarasohn.

Plaintiff Gerard Doto (Doto) was an employee of Sarasohn and was a named insured under his employer's commercial-automobile liability policy. On April 18, 1988, Doto was injured as a pedestrian in an automobile accident while in the course of company business, and incurred substantial medical expenses in excess of $750,000. Doto filed suit against the driver of the automobile, whose automobile-liability policy provided coverage in the amount of $250,000. Because the UIM coverage afforded Doto under his employer's policy was greater than the liability limits of the policy held by the driver, Doto initiated a claim for UIM benefits under the automobile policy issued by Utica in which he was a named insured. *See N.J.S.A.* 17:28–1.1e. Doto recovered $500,000, the full UIM coverage available under the automobile policy issued by Utica less the amount of liability insurance available under the driver's policy.

Doto's medical expenses exceeded the amounts recovered from the driver's policy and from Utica's UIM coverage under the automobile policy. In a letter dated March 19, 1990, to Gary LaRouche, the Utica District Claims Manager, Russo stated: "The insured has requested that we extend his under insured motorist claim into the umbrella liability policy. I have read the policy and can't see where his claim is excluded." While awaiting a response from LaRouche, Russo contacted various persons within Utica in an attempt to verify that the umbrella policy included UM/UIM coverage. Richard Gaffney of Utica's Errors and Omissions Department, whom Russo initially had contacted

about the claim for UIM coverage under the umbrella policy, allegedly had informed Russo in either 1989 or 1990 "that it's covered unless there [wa]s an exclusion endorsement." Gaffney's representation was apparently verified by Cheryl DePaul, a Utica underwriter, who had informed Gaffney that "our commercial umbrella policy does not exclude UM/UIM unless we attach an 8–UMB–14 endorsement."

Russo also contacted Bruce Hall, a Utica executive involved in underwriting commercial policies. On July 17, 1991, Russo telephoned Hall, telling him that he "also needs [a] statement that we are covering uninsured/underinsured motorist coverage." Hall told Russo that he would "send [a] letter stating [that] we haven't excluded the coverage from our umbrella." On the same day, Russo sent a letter to Hall, stating, "This will confirm our phone conversation of today in which you advised me that the umbrella liability policy does in fact cover $3,000,000. excess uninsured and underinsured motorist coverage."

On August 1, 1991, Russo again telephoned Hall, who informed Russo that "there was coverage on the umbrella policy . . . [b]ased on the fact [Utica] did not . . . put an endorsement on it excluding the coverage." Hall confirmed the contents of that conversation in a letter to Russo, also dated August 1, 1991, stating: "Per our conversation, we have not excluded uninsured and underinsured motorist coverage from our policy. Therefore, if it is covered on the primary [automobile policy] it should be covered on the [umbrella]." Hall indicated that he would not have sent the letter dated August 1, 1991, confirming UM/UIM coverage under the umbrella policy to Russo without his supervisor, Cheryl DePaul, having "agreed with [my] interpretation at the time." DePaul agreed that "if the underlying UIM limits match the underlying primary limits that the umbrella policy could be interpreted to include UIM coverage," implying that if Utica had intended to exclude UIM coverage it would have attached endorsement 8–UMB–14 "to make it expressly clear that UIM coverage was not going to be included in the umbrella [policy]."

Approximately one-and-one-half years after Russo's initial inquiry, LaRouche informed Russo in a letter dated September 17, 1991, that "[w]e regret to advise you that we cannot honor your claim, as the [umbrella] policy in question, does not provide underinsured motorist coverage in this state." In a complaint filed October 1991, Doto brought suit against Russo, alleging professional negligence in failing to procure an umbrella policy that included UM/UIM coverage. Additionally, Doto sought a declaratory judgment against Utica to determine his right to recover UIM coverage under the umbrella policy. Russo answered the complaint and filed a cross-claim against Utica demanding judgment "[d]eclaring that plaintiff, Gerard Doto, is entitled to Underinsured Motorist Coverage under Utica Mutual Insurance [umbrella policy]." In June 1993, Russo moved for summary judgment declaring that the "Utica umbrella policy in issue includes underinsured motorist coverage." Doto joined in that application. Utica filed a cross-motion for summary judgment on the same issue.

The trial court granted summary judgment in favor of Russo and Doto, holding that the conduct of the insurance company, its agent, and the insured, both before writing the policy and after the accident, indicated that all parties had considered the umbrella policy to include UM/UIM coverage.

In affirming, the Appellate Division majority emphasized that specific, cumulative circumstances supported the determination that the umbrella policy provided UM coverage: "[T]he reinsurer of the umbrella policy required an increase in primary UM[/UIM] limits to equal the liability limit or else UM[/UIM] would be excluded; the primary UM[/UIM] limits were increased to equal the liability limit; and there was no endorsement excluding UM[/UIM] coverage from the umbrella policy." The majority noted that "the conduct of Utica both before and after the accident is consistent with this conclusion." The dissenting member asserted that an "umbrella policy is purely and simply a liability policy," and that the majority's ruling could not properly rest "on

the basis of the insignificant and idiosyncratic communications involved here."

## II

### A

■ Both the dissenting member of the Appellate Division and Utica emphasize that umbrella policies characteristically do not contain UM/UIM coverage. Because umbrella policies are intended simply to provide comprehensive excess liability coverage, the purpose of umbrella coverage "is fundamentally different from a primary [automobile-] liability policy," *Stiefel v. Bayly, Martin & Fay, Inc.*, 242 *N.J.Super.* 643, 653, 577 *A.*2d 1303 (App.Div.1990), which also contains personal-injury protection, medical-payment benefits, collision or theft benefits, and UM/UIM coverage. Utica asserts that umbrella policies are therefore not intended to "fall within the definition of automobile liability insurance." 8C John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 5071.65 (1981); *see also Trinity Universal Ins. Co. v. Metzger*, 360 *So.*2d 960, 962 (Ala.1978) ("[A]n 'umbrella policy,' clearly intended as excess insurance to protect against catastrophic judgments and issued as supplementary insurance to existing primary policies themselves sufficient to meet the requirements of the law, is neither an automobile liability nor motor vehicle liability policy within the scope of the uninsured motorist statute, even though one of the primary policies may itself insure automobiles."); *Continental. Ins. Co. v. Howe*, 488 *So.*2d 917, 919 n. 3 (Fla.Dist.Ct. App.) ("An umbrella policy is fundamentally different from a primary liability policy."), *review denied*, 494 *So.*2d 1151 (1986). Typically, umbrella policies are intended to provide liability insurance against claims made against the insured by third-parties, and are not intended to provide the insured with a first-party source of recovery.

Courts have recognized the unique characteristics of umbrella policies in resolving whether such policies are mandated by the

UM statute enacted in their jurisdiction to include UM/UIM coverage. In states such as New Jersey that statutorily require only "minimum levels" of UM/UIM coverage, *see N.J.S.A.* 39:6A–14, although the insured may elect to purchase greater coverage up to a defined level, *see N.J.S.A.* 17:28–1.1b, courts have generally subscribed to the view that umbrella policies do not provide UM/UIM coverage. While acknowledging "that there is a general public policy underlying the UIM statute of increasing and broadening the public's protection against automobile accidents," *MacKenzie v. Empire Ins. Cos.*, 113 *Wash.*2d 754, 782 *P.*2d 1063, 1066 (1989), courts have concluded that the insured "receives the full protection contemplated by statute when he purchases the underlying automobile policy." *Hartbarger v. Country Mut. Ins. Co.*, 107 *Ill.App.*3d 391, 63 *Ill.Dec.* 42, 45, 437 *N.E.*2d 691, 694 (1982). Moreover, "[a]ny other interpretation would distort the actual purpose of the umbrella policy," *Matarasso v. Continental Casualty Co.*, 82 *A.D.*2d 861, 440 *N.Y.S.*2d 40, 41 (App.Div.1981), *aff'd*, 56 *N.Y.*2d 264, 451 *N.Y.S.*2d 703, 436 *N.E.*2d 1305 (1982), to provide only excess liability coverage. The Supreme Judicial Court of Massachusetts noted that courts construing statutorily mandated "minimal levels" of UM/UIM coverage "have reasoned that the protection contemplated by the UM statute is satisfied by the minimum UM coverage provided in the underlying primary auto polices, and umbrella policies therefore need not provide UM benefits." *Liberty Mut. Ins. Co. v. McLaughlin*, 412 *Mass.* 492, 590 *N.E.*2d 679, 680 (1992). Similarly, the Supreme Court of Montana observed in *Rowe v. Travelers Indemnity Co.*, 245 *Mont.* 413, 800 *P.*2d 157, 159 (1990), that in those states with minimum-level statutes, the objective "is to ensure that injured motorists can recover the same amount as would have been available from an insured motorist who maintained the minimum statutory limit of bodily injury liability coverage," and not to provide full recovery under the terms of any applicable policies when a person is injured by an uninsured or underinsured motorist. In *Continental Insurance Co., supra*, 488 *So.*2d at 920, the Florida District Court of Appeal, construing Rhode Island law, refused to find

UM/UIM coverage in an umbrella policy and determined that the "legislative purpose of ensuring that an injured motorist can recover up to the minimum limits required by statute is satisfied by the underlying primary liability insurance."

On the other hand, those states that require that the insurer provide UM/UIM coverage equal to automobile-liability coverage have determined that umbrella policies that provide excess-liability coverage must therefore provide equal UM/UIM coverage. *See Rowe, supra,* 800 *P.*2d at 159 ("Most jurisdictions which have 'full recovery' uninsured motorist statutes have concluded that since an umbrella policy includes liability coverage for motor vehicle accidents, an umbrella policy must offer an equivalent amount of uninsured motorist benefits to the insured in order to permit full recovery."). The Supreme Court of Louisiana determined that statutory language mandating UM/UIM coverage equal to the limits of bodily injury liability provided by the policy "compels a contrary inference" and requires "insurance companies doing business in this state to offer uninsured motorist coverage to an insured under the provisions of umbrella and excess policies." *Southern Am. Ins. Co. v. Dobson,* 441 *So.*2d 1185, 1191–92 (1983); *see also Cincinnati Ins. Co. v. Siemens,* 16 *Ohio App.*3d 129, 474 *N.E.*2d 655, 657 (1984) (finding that umbrella policy contained UM coverage when statutory language "requir[ed] the offering of equivalent uninsured motorist coverage upon the issuance of automobile liability insurance"). The case law does not suggest that the decisions construing umbrella policies to provide UM/UIM coverage depend on differences in the policy language; rather, a fair inference is that the coverage determination is based on the state statutory provision requiring UM/UIM coverage to equal liability coverage. See *Southern American Insurance Co., supra,* 441 *So.*2d at 1191.

To the extent the issue has been addressed in New Jersey, the Appellate Division in *Stiefel, supra,* 242 *N.J.Super.* at 653, 577 *A.*2d 1303, held that an umbrella policy did not provide excess UIM coverage to the plaintiff when the umbrella policy explicitly

disclaimed all first-party coverage by inclusion of a provision obligating the insured to indemnify the insurer "for any amount it [might] be required to pay to plaintiff as an insured." However, that court also noted that construing an umbrella policy to contain UM/UIM coverage "ignores the nature of umbrella coverage," and serves "[n]o public policy purpose." *Ibid.*

As a general matter, Utica correctly asserts that umbrella policies serve a purpose qualitatively different from UM/UIM coverage. In the absence of a requirement pursuant to a UM statute that UM/UIM coverage be equal to liability coverage, the general rule appears to be that umbrella policies should not be understood to provide UM/UIM coverage. However, other principles of insurance law influence our disposition of this appeal.

### B

An insurance policy is a contract. However, "while insurance policies are contractual in nature, they are not ordinary contracts but contracts of adhesion between parties who are not equally situated." *Meier v. New Jersey Life Ins. Co.,* 101 *N.J.* 597, 611, 503 *A.*2d 862 (1986). Even the most astute insured might find his or her "bargaining power is necessarily limited." *Zuckerman v. National Union Fire Ins. Co.,* 100 *N.J.* 304, 320, 495 *A.*2d 395 (1985). Insurance policies are often unilaterally "prepared by the company's experts, [persons] learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium." *Mazzilli v. Accident & Casualty Ins. Co.,* 35 *N.J.* 1, 7–8, 170 *A.*2d 800 (1961). Moreover, insurance contracts are not typically read or reviewed by the insured, whose understanding is often impeded by the complex terminology used in the standardized forms. *See Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 *F.*2d 599, 601 (2d Cir.) ("An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the

niceties of life insurance, who would read it colloquially."), *cert. denied,* 331 *U.S.* 849, 67 *S.Ct.* 1736, 91 *L.Ed.* 1858 (1947).

Because of the unique nature of contracts of insurance, courts assume "a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins. Co.,* 128 *N.J.* 165, 175, 607 *A.2d* 1255 (1992). To further that end, New Jersey courts often have construed ambiguous language in insurance policies in favor of the insured and against the insurer. *Sears Mortgage Corp. v. Rose,* 134 *N.J.* 326, 347, 634 *A.2d* 74 (1993); *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 *N.J.* 517, 529, 562 *A.2d* 208 (1989); *Sandler v. New Jersey Realty Title Ins. Co.,* 36 *N.J.* 471, 479, 178 *A.2d* 1 (1962); *Matits v. Nationwide Mut. Ins. Co.,* 33 *N.J.* 488, 495, 166 *A.2d* 345 (1960); *Hunt v. Hospital Serv. Plan,* 33 *N.J.* 98, 102, 162 *A.2d* 561 (1960). Consistent with that principle, courts also have endeavored to interpret insurance contracts to accord with the objectively reasonable expectations of the insured. "Recognizing the position of laymen with respect to insurance policies prepared and marketed by the insurer, our courts have endorsed the principle of giving effect to the 'reasonable expectations' of the insured for the purpose of rendering a 'fair interpretation' of the boundaries of insurance coverage." *Di Orio v. New Jersey Mfrs. Ins. Co.,* 79 *N.J.* 257, 269, 398 *A.2d* 1274 (1979). The insured's "reasonable expectations in the transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind." *Allen v. Metropolitan Life Ins. Co.,* 44 *N.J.* 294, 305, 208 *A.2d* 638 (1965). Moreover, we have recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, *see State, Dep't of Envtl. Protection v. Signo Trading Int'l.,* 130 *N.J.* 51, 62, 612 *A.2d* 932 (1992), and in exceptional circumstances, when the literal meaning of the policy is plain. *See Werner Indus. v. First State Ins. Co.,* 112 *N.J.* 30, 35–36, 548 *A.2d* 188 (1988) ("At times, even an unambiguous contract has been interpreted contrary to its

plain meaning so as to fulfill the reasonable expectations of the insured...."); *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 338, 495 *A.*2d 406 (1985); *Gerhardt v. Continental Ins. Cos.*, 48 *N.J.* 291, 297–99, 225 *A.*2d 328 (1966).

■ Nor have we permitted insurance companies to seek refuge in the literal language of their policies when the company's conduct and actions, or that of their agents, causes the insured to act or to fail to act based on that conduct. *See Harr v. Allstate Ins. Co.*, 54 *N.J.* 287, 304, 255 *A.*2d 208 (1969) ("[E]quitable estoppel is available to bar a defense in an action on a policy even where the estopping conduct arose before or at the inception of the contract, and that the parol evidence rule does not apply in such situations."). "It is clear that a carrier who has issued a policy, by its later conduct may, for equitable reasons, be refused the right to assert an exclusion or the absence of specific coverage. Our courts, over the years, have repeatedly so held." *American Handling Equip., Inc. v. T.C. Moffatt & Co.*, 184 *N.J.Super.* 131, 139, 445 *A.*2d 428 (App.Div.1982). When an insurer, having issued an insurance policy, subsequently modifies that policy to limit the scope of coverage, that modification must be accompanied by a clear "repudiation of liability rather than by a course [of conduct] leading the [insured] to believe he was protected." *Miller v. Motor Club Ins. Co.*, 117 *N.J.L.* 480, 482–83, 189 *A.* 636 (E. & A.1936).

## C

We examine the actions of the parties, necessarily considering as well whether alternative conduct or more precise language by the insurer, if chosen, "would have put the matter beyond reasonable question." *Mazzilli, supra*, 35 *N.J.* at 7, 170 *A.*2d 800; *see also Kook v. American Sur. Co.*, 88 *N.J.Super.* 43, 51, 210 *A.*2d 633 (App.Div.1965) ("[C]onsideration should be given [about] whether alternative or more precise language, if used, would have put the matter beyond reasonable question."). Moreover, we consider not only the actions of the parties at the time of forma-

tion of the policy, but the conduct both before and after. *Meier, supra,* 101 *N.J.* at 616–17, 503 *A.*2d 862. Our review of the record presented compels the conclusion that not only the insured, but the insurer as well, acted on the assumption and expectation that the umbrella policy provided UM/UIM coverage.

That General Reinsurance, the company with which Utica reinsured the umbrella policy, assumed the umbrella policy provided UM/UIM coverage is indisputable. General Reinsurance insisted that the UM/UIM coverage limits in the underlying liability policy be increased solely for the purpose of reducing its exposure to UM/UIM claims under the umbrella policy. Equally plain is that Utica also assumed that its umbrella policy provided UM/UIM coverage. No other explanation could justify Utica's communication to Russo, Sarasohn's agent, insisting that the UM/UIM limits in the underlying liability policy be increased and informing him that the necessary endorsement had already been processed.

No party contests the fact that Russo then informed Sarasohn of the necessary increase in the limits of the UM/UIM coverage for the underlying auto policy and that Sarasohn accepted the change and paid an additional premium. The only reasonable inference supported by the record is that Sarasohn paid the additional premium because the reinsurer and Utica had insisted that the added coverage was a prerequisite to Sarasohn's securing UM/UIM coverage in the umbrella policy as well as in the underlying automotive policy. "Indeed, if he was not so covered what justification could the company fairly advance for having taken that … sum from him…." *Allen, supra,* 44 *N.J.* at 306, 208 *A.*2d 638. Sarasohn, having paid the premium with the expectation of UM/UIM coverage in the umbrella policy, "could rightfully rely upon the retention of this … payment as an indication that it need not look for coverage elsewhere." *Englishtown Auction Sales, Inc. v. Mount Vernon Fire Ins. Co.,* 112 *N.J.Super.* 332, 337, 271 *A.*2d 292 (App.Div.1970); *see also New England Mut. Life Ins. Co. v. Hinkle,* 248 *F.*2d 879, 889 (8th Cir.1957) (Woodrough, J., dissenting) ("[I]t is such a serious wrong

for a company to make a man believe it has insured him and to take his money therefore...."), *cert. dismissed,* 358 *U.S.* 65, 79 *S.Ct.* 116, 3 *L.Ed.*2d 106 (1958).

Of less significance, but nevertheless relevant to the issue of the parties' assumptions and expectations about the scope of coverage, is the fact that after the accident several Utica employees confirmed that the umbrella policy contained UM/UIM coverage. Assurances to Russo from numerous Utica employees that the umbrella policy provided UM/UIM coverage would perhaps be insignificant if the policy specifically excluded such coverage, and no course of conduct had occurred in connection with the policy's issuance suggesting that the coverage existed. But in the context of this record, the affirmation by several knowledgeable Utica executives that UM/UIM coverage was included in Sarasohn's umbrella policy assumes added weight, in effect reinforcing the evidence suggesting that General Reinsurance and Utica, prior to the accident, regarded the umbrella policy as providing UM/UIM coverage.

 Moreover, Utica possessed a form designed for the express purpose of excluding the provision of UM/UIM coverage in the umbrella policy. An exclusion clause serves the purpose of delimiting and restricting coverage. *Capece v. Allstate Ins. Co.,* 88 *N.J.Super.* 535, 541, 212 *A.*2d 863 (Law Div.1965). An exclusion that is specific, plain, clear, prominent, and not contrary to public policy will be given effect. *Catton v. New Jersey Full Ins. Underwriting Assoc.,* 242 *N.J.Super.* 5, 10–11, 576 *A.*2d 1 (App. Div.1990); *Capece, supra,* 88 *N.J.Super.* at 541, 212 *A.*2d 863. Utica elected not to include its own specific endorsement stating that the "insurance provided by this [umbrella] policy shall not apply to sums which the Insured shall be legally entitled to recover as damages from the owner or operator of ... an underinsured automobile because of personal injury sustained by the Insured." The decision not to include the standard exclusion endorsement is consistent with the actions of General Reinsurance and Utica prior to the issuance of the renewal policy and with the

post-accident assurances by Utica executives that the policy provided UM/UIM coverage.

■ Utica asserted for the first time that the umbrella policy did not contain UM/UIM coverage in September 1991, over three years after the accident occurred. We are persuaded, based on the circumstances evident in the record, that Utica is estopped from denying coverage. Utica pursued a course of conduct during the renewal of the umbrella policy in August 1987 that would have convinced an objectively reasonable insured to believe that the umbrella policy contained UM/UIM coverage. In effect, Utica told Sarasohn's agent that the umbrella policy would *not* provide UM/UIM coverage *unless* the UM/UIM limits in the underlying policy were raised. Abiding by that instruction, Sarasohn authorized the increased limits and paid the higher premium. Consequently, Sarasohn must have understood that the umbrella policy included UM/UIM coverage. That impression was confirmed by the post-accident representations and assurances by several Utica employees that the umbrella policy provided such coverage. "It is clear that a carrier who has issued a policy, by its later conduct may, for equitable reasons, be refused the right to assert an exclusion or the absence of specific coverage." *T.C. Moffatt & Co., supra*, 184 *N.J.Super.* at 139, 445 *A.*2d 428; *see Griggs v. Bertram*, 88 *N.J.* 347, 355–56, 443 *A.*2d 163 (1982) ("Under certain circumstances an insurance carrier may be estopped from asserting the inapplicability of insurance to a particular claim against its insured despite a clear contractual provision excluding the claim from the coverage of the policy."); *see also Jackson Nat'l Life Ins. Co. v. Receconi*, 113 N.M. 403, 827 *P.*2d 118, 128 (1992) (reasoning that knowledge combined with subsequent acceptance and retention of premium constitute waiver of condition).

## III

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices HAN-DLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLE-MAN—7.

*Opposed*—None.