21 A.3d 1151

PASSAIC VALLEY SEWERAGE COMMISSIONERS, IRENE G. AL-
MEIDA, JAMES KRONE, FRANK J. CALANDRIELLO, JR., DO-
MINIC W. CUCCINIELLO, CARL S. CZAPLICKI, JR., PETER
A. MURPHY, ANGELINA M. PASHERCIA, THOMAS J. POW-
ELL, DONALD TUCKER, ROBERT J. DAVENPORT, FRANK
D'ASCENSIO, DANIEL CARDELLICHIO, SHELDON LIPKE,
RAYMOND LUCHKO, DANIEL BECHT, AND RONALD W. GIA-
CONIA, PLAINTIFFS–APPELLANTS, v. ST. PAUL FIRE AND
MARINE INSURANCE COMPANY, DEFENDANT, AND GE
COMMERCIAL INSURANCE F/K/A COREGIS INSURANCE
COMPANY, DEFENDANT–RESPONDENT.

Argued January 31, 2011—Decided June 21, 2011.

---

*Daniel R. Bevere* argued the cause for appellants (*Piro, Zinna, Cifelli, Paris & Genitempo,* attorneys; *Mr. Bevere* and *James M. Piro,* on the briefs).

*Darcy L. Ibach,* a member of the Illinois bar, argued the cause for respondent (*Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys; *Ms. Ibach* and *Marc R. Jones,* on the briefs).

Judge CARCHMAN (temporarily assigned) delivered the opinion of the Court.

Following years of contentious litigation and after months of mediator-assisted negotiations, plaintiff Passaic Valley Sewerage Commission (PVSC) [1] and Spectraserv, Inc. (Spectraserv), without a concession of fault by either party, entered into a settlement agreement providing for the transfer of assets and other consideration from PVSC to Spectraserv. Rather than advance monies to Spectraserv, PVSC agreed, among other things, to provide in-kind services and forbear from pursuing alleged regulatory violations by Spectraserv.

PVSC sought indemnification for its "loss"—the value of the settlement—from its insurer, defendant Coregis Insurance Company (Coregis). Coregis declined to indemnify PVSC, asserting that Coregis had no obligation to do so under the terms of its Policy, which defined a "loss" as "money damages." The issue that we address is whether the definition of "money damages" under the terms of PVSC's policy encompasses the value of services rendered and assets surrendered in lieu of cash payments. Both the Chancery Division and Appellate Division concluded that Coregis correctly interpreted its Policy and was not

---

[1] Although this action is brought by the PVSC Commissioners on behalf of PVSC, the true party in interest is PVSC.

obligated to indemnify PVSC for the value of the settlement. We granted certification, 202 *N.J.* 346, 997 *A.*2d 230 (2010), and affirm.

## I.

We adduce the following facts from the record.

PVSC is a regulatory body created by the State of New Jersey, which regulates the collection and disposal of wastewater generated in a four-county area along the Passaic Valley River Basin. *N.J.S.A.* 58:14-1 to -37. Pursuant to its statutory authority, PVSC requires its large industrial users to obtain permits to utilize the PVSC system. PVSC issues, reviews and modifies the permits on an as-needed basis, particularly when conditions change with regard to the user.

Spectraserv is a private business entity in the wastewater hauling and treatment business. It owns and operates a facility within PVSC's district and discharges wastewater into the PVSC system. It is required to maintain a permit with PVSC as well as comply with PVSC's rules and regulations regarding the discharge into PVSC's systems.

## A.

On August 14, 1997, Spectraserv filed a complaint in the United States District Court for the District of New Jersey (*Passaic I* ) against PVSC and certain officers, employees and PVSC Commissioners, alleging that defendants wrongfully withheld renewal of Spectraserv's permit and misused PVSC's regulatory authority over Spectraserv.

At the time of action, PVSC was insured by Coregis under a "claims made" Public Entity Management Liability (PEML) policy, which was effective from March 20, 1997 through January 1, 1998 (the "Coregis Policy" or "Policy"). The Coregis Policy provided:

The Company will pay on behalf of the Insureds Loss as a result of civil Claims made against the Insureds by reason of a Wrongful Act, provided that Claim is first made during the Policy Period. . . .

## The Policy contained the following definitions:

F. "Wrongful Act" means any act, error or omission of an Insured constituting a breach of a duty imposed by law or a breach of an Employment Contract.

H. "Claim" means a demand for *Money Damages* as of right.

. . . .

I. *"Money Damages"* means monetary compensation for past harms or injuries.

L. "Loss" means *Money Damages* which the Insured becomes legally obligated to pay by reason of a Wrongful Act. . . .

Loss does not include:

1. Punitive damages, exemplary damages or the multiplied portions of any damage award;

2. Sanctions, fines or penalties;

3. Liquidated damages as provided under a contract or statute;

4. Return of taxes, assessments, penalties, fines and/or fees;

6. Matters uninsurable under the law or against public policy. . . .

[ (Emphasis added).]

## The Coregis Policy also contained the following exclusions:

This Policy does not apply to the following, regardless of the cause of action or legal theory alleged:

A. any Claim or Loss Arising Out of any Insured gaining profit, remuneration or advantage to which any Insured was not entitled.

B. any Claim or Loss Arising Out of any criminal, dishonest, malicious, fraudulent or knowingly wrongful act or omission.

C. *any demand or proceeding seeking relief or redress in any form other than Money Damages,* including any form of injunction or other equitable relief, including, but not limited to restitution, replevin, unjust enrichment, declaratory judgments, or an accounting.

I. any claim or Loss Arising Out Of inverse condemnation, temporary or permanent taking adverse possession or dedication by adverse use.

M. any Claim or Loss Arising Out Of breach of contract, whether oral, written or implied, except any Employment Contract.

[ (Emphasis added).] The Policy also provided that:

As respects Claims for Loss which is covered by this Policy:

F. The Insured shall not settle any Claim without the prior written consent of the Company. The Company shall not be obligated to indemnify any Insured for Loss in connection with the settlement of a Claim to which the Company did not provide prior written consent.

On October 31, 1997, Coregis agreed to undertake the defense of *Passaic I* pursuant to a reservation of rights and authorized PVSC to retain counsel for its defense. Counsel then moved to dismiss the federal action for failure to state a claim. The motion was never heard, and on September 11, 1998, the complaint was administratively dismissed.

### B.

In July 1999, PVSC issued a Notice of Violation (NOV) to Spectraserv for failure to maintain an acceptable monitoring station for its discharged liquid waste.

PVSC then filed an action in the Chancery Division (*Passaic II* ) to compel Spectraserv to change its plant equipment and remedy the issues underlying the 1999 NOV. Spectraserv filed an answer and counterclaim to the complaint, as well as a third-party complaint against several individual officers, employees and Commissioners of PVSC.

Subsequent to the filing, PVSC issued eleven more NOVs between April 6, 2000, and June 5, 2001. However, a report prepared by Spectraserv's expert, Brown and Caldwell in November 2002 entitled "Evaluation of Alleged Discharge of Solids by Spectraserv" challenged the validity of those NOVs, raising questions regarding PVSC's data collection. Nevertheless, PVSC continued issuing NOVs, resulting in 181 NOVs issued between March 2000 and January 2005.

The claims asserted by Spectraserv in its *Passaic II* counterclaim incorporated counts previously asserted against PVSC in *Passaic I.* In addition to the reasserted claims, Spectraserv alleged new claims, including tortious interference, *ultra vires* actions, fraudulent inducement, breach of contract, breach of duty of good faith and fair dealing and violation of the New Jersey Right to Know Law. [*N.J.S.A.* 47:1A–1 to –13.] An amended counterclaim also added two additional claims, fraudulent concealment and abuse of process (Counts Thirteen and Fourteen).

Upon the receipt of the counterclaim in *Passaic II,* PVSC sought a defense and indemnification from its current insurer, St. Paul Fire and Marine Insurance Company (St. Paul), and Coregis, whose Policy term had ended on January 1, 1998. PVSC was insured under two PEML policies with St. Paul (St. Paul Policy), with effective dates from January 1, 1999 through January 1, 2001. St. Paul disclaimed coverage for *Passaic II,* asserting that the claim was not "first made" during the St. Paul Policy period.

Coregis issued a reservation of rights letter to PVSC on July 17, 2000, stating that "[b]ased upon the information available to us and the allegations contained in the Complaint as presently framed, it appears that your policy may only cover part of this Loss." Coregis also sent two letters to PVSC in 2001, requesting additional information on the status of the litigation. Coregis stated that "[i]t is important to an effective working relationship and required under the policy that we are kept apprised of the course of the litigation."

In 2002, PVSC responded by filing an action against St. Paul seeking a declaratory judgment that St. Paul was required to provide a defense and indemnification for *Passaic II.* In 2003, PVSC amended its complaint to add Coregis as a defendant, seeking a declaratory judgment that Coregis was required to provide a defense and indemnification for *Passaic II* as well.

## C.

In 2004, PVSC and Spectraserv entered into settlement negotiations. Coregis sent a letter dated April 8, 2004, confirming Coregis's agreement to provide a defense for the *Passaic II* counterclaim, subject to a "full" reservation of rights as to all claims, and supplementing its earlier reservation of rights. This was followed, on October 6, 2004, by a letter from Coregis to PVSC's counsel, proposing payment of past defense-related costs. Coregis also stated that the two parties would confer regarding litigation strategy. However, Coregis warned PVSC:

We understand that PVSC has made one or more settlement proposals to Spectraserv that would entail future cooperation between PVSC and Spectraserv, including potential price breaks to Spectraserv. Please note that although Coregis does not necessarily object to a settlement agreement of that type, it *is extremely unlikely that Coregis would have any obligation to make payment to PVSC* to make up any asserted loss in revenue on PVSC's part.

[ (Emphasis added).]

The settlement negotiations between Spectraserv and PVSC continued, but because PVSC was unable to meet Spectraserv's cash payment demands, the parties agreed to explore a settlement that would result in an alternative means of compensating Spectraserv for its alleged damages.

After months of mediation, PVSC, Spectraserv and the individual defendants reached a settlement on June 30, 2005. The settlement encompassed three discrete agreements to resolve six claims in five different lawsuits. The first agreement provided for the entry of a consent order resolving the NOVs that PVSC had issued to Spectraserv. PVSC agreed to accept $100,000 in lieu of all civil penalties that could have been assessed against Spectraserv.[2] The second agreement provided that PVSC agreed to accept, treat and dispose of Westchester County's[3] sludge for a period of not more than five years. The third agreement with Encap Golf Holdings, LLC (Encap), required PVSC to assign to Spectraserv the right to deliver and dispose of sludge at Encap.

Although the settlement agreement failed to include a stated valuation for the various obligations imposed on PVSC, other than the $100,000 "payment" to PVSC for the forbearance on pursuing the NOVs, PVSC retained an expert, Kenneth I. Rubin, Ph.D. to value the settlement. Rubin valued PVSC's cost of the Encap portion of the settlement as falling between $2,874,797 and $5,431,591. Addressing the treatment of Westchester County

---

[2] No monies were paid by Spectraserv. PVSC agreed to "accept" the sum of $100,000 expended by Spectraserv to modify its wastewater monitoring station in lieu of all civil penalties.

[3] Westchester County, New York was a contracting party with Spectraserv.

sludge, Rubin opined that PVSC would be foregoing profits of between $1,591,364 and $3,956,137. Finally, regarding dismissal of the NOVs, Rubin valued the dismissed fines at between $1,497,500 and $7,793,000. In sum, Rubin's estimate of the cost of the settlement agreement to PVSC was between $5,963,661 and $17,180,728, a range of $11,217,067.

### D.

Subsequent to the settlement agreement between PVSC and Spectraserv, PVSC and Coregis resolved their coverage disputes. On December 19, 2005, the trial court granted summary judgment in favor of St. Paul, concluding that *Passaic II* related back to *Passaic I* and fell within the Coregis Policy coverage period. Then, on September 11, 2006, the trial court entered partial summary judgments in favor of both PVSC and Coregis. The judge determined that Coregis owed a defense to PVSC on Counts Three (antitrust violation), Eleven (breach of duty of good faith and fair dealing) and Fourteen (abuse of process) of Spectraserv's *Passaic II* counterclaim. He further concluded that Coregis did not owe a defense on the remaining claims.

Following the judge's ruling, PVSC and Coregis entered into a settlement agreement wherein PVSC received $1.2 million for the reimbursement of counsel fees and costs expended for the defense of *Passaic I* and *Passaic II*. PVSC and Coregis then filed cross-motions for summary judgment on two final issues: indemnification for the Spectraserv settlement, as well as attorney's fees in prosecuting the 2003 declaratory judgment action against Coregis. *See R.* 4:42–9(a)(6). Coregis disclaimed liability to indemnify PVSC for the Spectraserv settlement asserting that, consistent with the terms of its Policy, it had no obligation to indemnify absent the payment of "money damages."

Both the Chancery Division and Appellate Division agreed.[4]

---

[4] During the pendency of this appeal, PVSC and St. Paul settled their dispute, and PVSC dismissed its appeal as to St. Paul.

## II.

### A.

■ The Coregis Policy provides that Coregis will pay "Loss as a result of civil claims made against [PVSC] by reason of a Wrongful Act...." The conflict here arises out of the differing interpretations of what constitutes "loss" under the Policy, and specifically the term "money damages." As we have noted, under the Policy, "loss" is defined as "money damages." In the exclusions section of the Policy, Coregis excludes "any demand or proceeding seeking relief in any form other than Money Damages...."

Coregis's argument is stated simply. It contends that the language of the Policy is narrowly drafted and clear: loss is defined as "money damages," which means "the payment of money" and the settlement negotiated between PVSC and Spectraserv is not "money."

PVSC suggests a broader interpretation of the same language suggesting that "loss" is the surrender of "assets of value." According to PVSC, the term "money damages" does not require a "cash payment," and it is entitled to indemnification and a hearing to determine the value of the loss suffered in connection with the Spectraserv settlement.

The primary issue for our consideration is whether the definition of "loss" as "money damages" encompasses the value of the services rendered and assets surrendered in the Spectraserv settlement. We begin our analysis with basic principles that inform our decision.

■ Contracts for insurance are unique, and we take "a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 175, 607 *A.2d* 1255 (1992). Generally, when interpreting an insurance policy, we give the policy's words their

plain, ordinary meaning. *Nav–Its, Inc. v. Selective Ins. Co.*, 183 *N.J.* 110, 118, 869 *A.*2d 929 (2005).

⬛ Critically important to our analysis is the principle that to fulfill the expectations of the parties, we will enforce the terms of an insurance policy as written if the language is clear. *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960). If the policy terms are clear, we interpret the policy as written and avoid writing a better insurance policy than the one purchased. *Villa v. Short*, 195 *N.J.* 15, 23, 947 *A.*2d 1217 (2008) (quoting *President v. Jenkins*, 180 *N.J.* 550, 562, 853 *A.*2d 247 (2004)).

⬛ If the terms are not clear, but instead are ambiguous, we construe them against the insurer and in favor of the insured to give effect to the insured's reasonable expectations. *Flomerfelt v. Cardiello*, 202 *N.J.* 432, 441, 997 *A.*2d 991 (2010) (citing *Doto v. Russo*, 140 *N.J.* 544, 556, 659 *A.*2d 1371 (1995)); *Voorhees, supra*, 128 *N.J.* at 175, 607 *A.*2d 1255.

⬛ "A genuine ambiguity arises only where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Progressive Cas. Ins. Co. v. Hurley*, 166 *N.J.* 260, 274, 765 *A.*2d 195 (2001) (internal quotations omitted). Ambiguous policies are those that are "overly complicated, unclear, or written as a trap for the unguarded consumer." *See Zacarias v. Allstate Ins. Co.*, 168 *N.J.* 590, 604, 775 *A.*2d 1262 (2001) (citing *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 475, 170 *A.*2d 22 (1961)). When construing an ambiguous clause in an insurance policy we consider whether clearer draftsmanship by the insurer would have put the matter beyond reasonable question. *Hurley, supra*, 166 *N.J.* at 274, 765 *A.*2d 195. Most important, the rule that contracts of insurance will be construed in favor of the insured and against the insurer will not be permitted to have the effect of making a plain agreement ambiguous and then construing it in favor of the insured. *Petronzio v. Brayda*, 138 *N.J.Super.* 70, 76, 350 *A.*2d 256 (App.Div.1975).

Applying these well-settled principles, we conclude that the Coregis Policy is not ambiguous in its definition of "loss" or "money damages."

As we have noted, the Policy defined "loss" as "money damages." "Money damages" in turn, is defined as "monetary compensation for past harms or injuries." "Monetary" is defined as "of or relating to money." *Black's Law Dictionary* 1021 (7th ed. 1999). These are not sophisticated terms but plain language reflecting the intentions of the parties when they entered into this insurance contract.

To aid in understanding the construct of the Policy provisions, we look to the language of not only what is covered but what is excluded. The parameters of indemnification are limited to "money damages" and expressly exclude indemnification for that which is not "money damages." The exclusion section of the Policy further clarifies that there is no indemnification against "any demand or proceeding seeking relief or redress *in any form* other than Money Damages, including any form of injunction or other equitable relief." (Emphasis added). The Policy's qualification of the term "compensation" with "monetary," indicates that the Policy does not apply to more general forms of compensation; only compensation "of or pertaining to money."

The Spectraserv settlement included the entry of a consent order resolving the NOVs that PVSC had issued to Spectraserv; PVSC's agreement to accept, treat and dispose of Westchester County sludge; and PVSC's agreement to assign to Spectraserv the right to deliver and dispose sludge at Encap.

PVSC argues that the settlement can be valued and, as such, the damages can be quantified as money damages. We recognize that courts are capable of valuing elements of damages. *See, e.g. Borbonus v. Daoud,* 34 *N.J.Super.* 54, 61, 111 *A.*2d 443 (Ch.Div. 1955). "Lost profits may be recoverable if they can be established with a 'reasonable degree of certainty.' Anticipated profits that are remote, uncertain or speculative, however, are not recoverable." *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.,*

226 *N.J.Super.* 200, 224, 543 *A.*2d 1020 (App.Div.1988) (citing *Stanley Co. of Am. v. Hercules Powder Co.,* 16 *N.J.* 295, 314, 108 *A.*2d 616 (1954)), *aff'd,* 118 *N.J.* 249, 571 *A.*2d 294 (1990). However, while courts are capable of and can, hypothetically, value the assets transferred in the settlement agreement, part of the benefit of Coregis's bargain with PVSC was limiting its exposure by precluding indemnification for non-monetary claims. In defining "loss" narrowly, Coregis also sought to avoid the necessity of litigating the value of non-monetary losses. The speculative nature of the settlement agreement here reinforces this view. Although the expert opinion offered by Rubin purports to value the settlement agreement, the terms of the agreement are, by nature, "in kind" rather than monetary. The lack of precision, as demonstrated by the eleven million dollar valuation range—constituting an approximately 300% difference between the highest and lowest estimates—provides further evidence that the settlement agreement was not of a defined value.[5] Not only did the settlement fail to involve money damages, it was a business arrangement involving the performance of services, designed to benefit the parties.

The exclusion section lends further support to Coregis's intention not to indemnify for this type of business arrangement. The exclusion section proscribes coverage for any form of injunction or equitable relief and any relief other than money damages. For example, forbearance on recovery penalties for the NOV may satisfy the needs of the parties for settlement purposes but compromises PVSC's responsibility in enforcing its regulations. It implicates the application of "equitable" principles to achieve a business end. Such resolution hardly equates to a compensable loss under an insurance policy. The exclusions generally demonstrate Coregis's intent to preclude indemnification of settlements encompassing anything other than identified, ascertained and pre-

---

[5] One example of the speculative nature of the purported loss was Rubin's estimate of the value of the NOVs. Rubin estimated the value of the fines at between $1,497,500 and $7,793,000. However, the NOVs were never adjudicated and were contested by Spectraserv.

cisely calculated money damages. Coregis did not bargain for the valuation process and procedure that would implicate the proofs presented here. We will not reconstruct the terms of the Policy to achieve that end.

### B.

While this narrow issue has not been addressed in New Jersey, other authority supports our view.

In *International Insurance Co. v. Metropolitan St. Louis Sewer District,* 938 *F.Supp.* 568 (E.D.Mo.1996), the insured sought indemnification for credit-refunds issued to its consumers. *Id.* at 570. The policy excluded coverage for "claims, demands or actions seeking relief, or redress, in any form other th[a]n money damages[.]" *Id.* at 569. The District Court explained that the term "'damages' as used in the insurance context, is unambiguous. . . . '[T]he plain meaning of the term damages as used in the insurance context refers to legal damages and does not include equitable monetary relief.'" *Ibid.* (quoting *Cont'l Ins. Cos. v. Ne. Pharm. & Chem. Co.,* 842 *F.*2d 977, 985 (8th Cir.) (en banc), *cert. denied,* 488 *U.S.* 821, 109 *S.Ct.* 66, 102 *L.Ed.*2d 43 (1988)).

Here, the Policy is more specific because it defines "money damages" as "monetary compensation." As in *Metropolitan St. Louis,* we agree that the definition of "money damages" as "monetary compensation" bespeaks unambiguous language.

In *116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Co.,* 433 *Mass.* 373, 742 *N.E.*2d 76 (2001), plaintiff alleged that Aetna breached its obligations under the insurance policy by failing to reimburse the trust for legal fees and costs incurred in defending a claim for injunctive relief that had been brought against plaintiff. Aetna denied coverage on the basis that the policy did not cover "equitable relief." The policy stated that it would reimburse for "loss." *Id.* at 77. Excluded from the policy was "anything other than money damages." *Ibid.* In concluding that plaintiff was not entitled to indemnification from Aetna, the Massachusetts Supreme Judicial Court explained that

in Massachusetts, "damages" is defined as "the word which expresses in dollars and cents the injury sustained by the plaintiff." *Id.* at 79. The court further noted that "[e]ven if the term 'damages' were ambiguous, any ambiguity in the 'Insuring Agreement' section is dispelled by the 'Exclusions' section that directly follows," which states that "[t]his insurance does not apply to any claim ... for anything other than money damages." *Ibid.* The court concluded that "[r]eading this policy language, the trust could not reasonably expect that the policy would cover an action for injunctive relief that did not seek money damages." *Ibid.* Because the underlying action involved an injunction, the costs associated with defending the action were not covered.

In *Continental, supra,* 842 *F.*2d at 979, the Eighth Circuit, in a sharply divided en banc decision, interpreted a policy, which stated that the insurer would cover "all sums which the insured shall become legally obligated to pay as damages[.]" The majority concluded that the term "damages" in the insurance context is "not ambiguous" and refers only to "legal damages," not "equitable monetary relief." *Id.* at 985. In *Continental,* the equitable monetary relief contemplated was cleanup costs.

The principle espoused in *Continental* has arisen in a variety of contexts. *See Hays v. Mobil Oil Corp.,* 930 *F.*2d 96, 101 n. 9 (1st Cir.1991) (comparing *Continental* with other authority to determine whether damages may include environmental cleanup costs); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 *F.*2d 1200, 1207 (2d Cir.1989) (noting that, when defined by a policy, "the term damages does not include equitable relief-even when such is monetary," but ultimately concluding that remedial costs were "damages"), *cert. denied,* 496 *U.S.* 906, 110 *S.Ct.* 2588, 110 *L.Ed.*2d 269 (1990); *New Castle Cnty. v. Hartford Accident & Indem. Co.,* 933 *F.*2d 1162, 1185 (3rd Cir.1991) (citing but ultimately disagreeing with *Continental* as to whether "response costs and injunctive relief" were damages), *cert. denied,* 507 *U.S.* 1030, 113 *S.Ct.* 1846, 123 *L.Ed.*2d 470 (1993); *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* 944 *F.*2d 940, 946 (D.C.Cir.1991) (diverging from

*Continental,* focusing on the "common and ordinary understanding of damages"), *cert. denied,* 503 *U.S.* 1011, 112 *S.Ct.* 1777, 118 *L.Ed.*2d 435 (1992).

Other jurisdictions have seemingly adopted a different view, but these decisions are distinguishable. In *Earth Elements, Inc. v. National American Insurance Co.,* 41 *Cal.App.*4th 110, 48 *Cal. Rptr.*2d 399 (1995), the settlement between the parties provided for the dismissal of claims in exchange for the dismissal of counterclaims, but involved no monetary payments. *Id.* at 402. In holding that the insurance company owed coverage, the court rejected the insurer's claim that it was not required to indemnify because the insured did not make any payments to the other party. The court also explained, "[t]here is no analytical distinction between surrendering money in exchange for a settlement and exchanging any other item of value. While the value of money is apparent on its face, an intangible item is equally capable of being evaluated." *Ibid.*

Unlike the issue presented to us, the court in *Earth Elements* did not interpret specific policy language. In fact, in *Earth Elements,* there is no reference to either the policy language or a definition of loss. The court concluded that based on the insurer's failure to defend, the insured was entitled to settle and sue the insurer to recover the amount of the settlement. *Id.* at 116, 48 *Cal.Rptr.*2d 399.

In *Sauk County v. Employers Insurance of Wausau,* 240 *Wis.*2d 608, 623 *N.W.*2d 174 (App.2000), *review denied,* 242 *Wis.*2d 543, 629 *N.W.*2d 783 (2001), the insured claimed that it was entitled to indemnification and a hearing to determine the value of a hold harmless agreement, and the insurer claimed that a hold harmless agreement did not constitute a "payment" under the policy. *Id.* at 176–77. The court held that payment can include "something other than money." *Id.* at 178. The court defined payment as "giving of something of value and its acceptance in satisfaction." *Ibid.* (quotation omitted).

That policy language in *Sauk County* is decidedly different from the language here. In *Sauk County*, the policy provided that the insurer's duty to indemnify was "limited to *payment* that Sauk County incurred under the counterclaims...." *Id.* at 176 (emphasis added and editing marks omitted). "Payment" is a more general term than "money damages" or "monetary compensation." Payment is defined as "1: the act of paying or giving compensation: the discharge of a debt or an obligation"; "2: something that paid: something given to discharge a debt or obligation or to fulfill a promise...." *Webster's Third New International Dictionary* 1659 (1981).

The United States Court of Appeals for the Seventh Circuit also considered this issue in *Platinum Technology, Inc. v. Federal Insurance Co.*, 282 *F*.3d 927 (7th Cir.2002). In *Platinum Technology*, the insured sought indemnification for a settlement in which it relinquished original equipment manufacturer (OEM) credits. The court concluded that the insured was entitled to reimbursement from the insurer for the reasonable value of the OEM credits because they were surrendered in exchange for settlement. *Id.* at 932–33.

As in *Earth Elements, Platinum Technology* focused on the carrier's breach of its duty to defend. The insured settled, and the court concluded that the insurer owed the insured the reasonable value of the OEM credits as damages for breach of the duty to defend. The court did not engage in an analysis of any specific contract language regarding the definition of loss or whether a non-monetary settlement constituted loss. *Ibid.* The duty on the carrier to defend and the consequences of a breach of that duty are well settled in our jurisprudence. *See* discussion *infra* Part III. Neither *Earth Elements* nor *Platinum Technology* suggest any divergence from that view nor do these decisions provide support for PVSC's interpretation of the Policy.

We adhere to the principle enunciated in *Metropolitan St. Louis* that the plain language of the Policy provides the best indicia of its intent and precludes PVSC from recovery. We conclude that the

plain language and meaning of the Policy terms informs our result, and PVSC is not entitled to indemnification.

## III.

PVSC further asserts in an alternative argument that Coregis breached its duty to provide a defense in *Passaic II*, and is obligated to indemnify PVSC against the resulting Spectraserv settlement.

The failure to defend, if established, has profound implications on the rights of the parties. While the insurer generally enjoys the right to control settlements, "it is a right which an insurer forfeits when it violates its own contractual obligation to the insured." *Fireman's Fund Ins. Co. v. Sec. Ins. Co.*, 72 *N.J.* 63, 71, 367 *A.*2d 864 (1976) (internal citations omitted).

> Where an insurer wrongfully refused coverage and a defense to its insured, so that the insured is obliged to defend [itself] in an action later held to be covered by the policy, the insurer is liable for the amount of the judgment obtained against the insured or of the settlement made by him. The only qualifications to this rule are that the amount paid in settlement be reasonable and that the payment be made in good faith.

[*Griggs v. Bertram*, 88 *N.J.* 347, 364, 443 *A.*2d 163 (1982) (quotations omitted).]

We must consider whether Coregis was in default of its duty to defend when the Spectraserv settlement was crafted. A breach of the duty to defend will trigger indemnification of the Spectraserv settlement, and will not be limited to the Coregis Policy's definition of "loss." Both the Chancery Division and the Appellate Division concluded that Coregis did not breach its duty to defend PVSC in *Passaic II*. We reach the same conclusion.

PVSC sought defense of *Passaic II* from Coregis, which responded on July 17, 2000 by issuing a reservation of rights letter. In 2003, PVSC sought a judgment declaring that Coregis owed a duty of defense and indemnification in *Passaic II*, as well as fees expended by PVSC in *Passaic I*. On April 8, 2004, Coregis issued an updated reservation of rights letter, which acknowledged that

PVSC had retained counsel to defend *Passaic II*. The letter informed PVSC that Coregis would work with PVSC and PVSC's counsel to settle the cost of defending *Passaic II* and requested copies of PVSC's legal bills in furtherance of that goal. PVSC initially demanded $4 million dollars from Coregis. On October 6, 2004, Coregis offered to pay a portion of the incurred defense fees for *Passaic II*. In a second offer letter, dated October 28, 2004, Coregis calculated costs in the amount of $1,101,827.23. No settlement resulted from these offers.

The trial judge concluded that Coregis owed a defense to PVSC only on three Counts of *Passaic II*. As a result, PVSC and Coregis entered into a settlement and release agreement wherein Coregis paid PVSC $1.2 million for the reimbursement of counsel fees and costs in *Passaic I* and Counts Three, Eleven, and Fourteen of *Passaic II*.

 We conclude that Coregis acted appropriately in proffering a defense while preserving its rights through the issuance of reservation of rights letters. Reservation of rights letters have long been regarded as proper defense mechanisms for insurance companies. *See Burd v. Sussex Mut. Ins. Co.*, 56 *N.J.* 383, 393–95, 267 *A.*2d 7 (1970) (reviewing New Jersey decisions and concluding that where insurer did not issue a reservation of rights letter it could not disclaim coverage of judgment). By reserving rights and providing defense costs on covered claims, an insurer fulfills its defense obligations. *Ibid.* Where there is a dispute regarding coverage, "[t]he practical effect of *Burd* is that an insured must initially assume the costs of defense ... subject to reimbursement by the insurer if [the insured] prevails on the coverage question." *N.J. Mfrs. Ins. Co. v. Vizcaino*, 392 *N.J.Super.* 366, 370–71, 920 *A.*2d 754 (App.Div.2007) (quotation omitted).

 When a complaint includes both covered and uncovered counts the carrier may refuse defense on the uncovered counts and dispute coverage. *See Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 *N.J.* 18, 22–23, 483 *A.*2d 402 (1984).

> [T]he carrier should not be permitted to assume the defense if it intends to dispute its obligation to pay a plaintiff's judgment, unless of course the insured expressly agrees to that reservation. This is not to free the carrier from its covenant to defend, but rather to translate its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay.
> [*Vizcaino, supra,* 392 *N.J.Super.* at 370, 920 *A.*2d 754 (quotation omitted).]

By permitting the dispute of uncovered claims, courts protect both parties by ensuring that the insurer does not incur responsibility for uncovered claims, and that the insured is entitled to both defense and indemnity if the dispute is resolved in its favor. *Ibid.*

Here, Coregis issued three reservation of rights letters in association with *Passaic II* and thrice provided PVSC with notification of the implications of the Coregis Policy terms. In the course of Coregis's investigation into the claims, seven letters were sent to PVSC, all of which requested supplemental information from PVSC. One letter, written by a Coregis claims examiner, reveals that PVSC Counsel failed to cooperate with Coregis' efforts to investigate *Passaic II.*

> As I advised ... in my e-mail sent August 30, 2001, our last litigation update followed the denial of the motion to dismiss and denial of the appeal of this ruling in January 2001. *It is important to an effective working relationship and required under our policy that we are kept apprised of the course of litigation. Please provide me [with] an update as to the status of the litigation as soon as possible* and make every effort to keep me informed on the further course of litigation.
> [ (Emphasis added).]

Despite PVSC's initial lack of cooperation, Coregis worked with PVSC and PVSC's counsel to calculate appropriate damages.

PVSC is correct in its assertion that Coregis previously moved for summary judgment to disclaim liability to defend *Passaic II.* However, a good-faith challenge to coverage is not a breach of an obligation to defend. Coregis was entitled to dispute the coverage of those counts under *Vizcaino,* based on the language of the policy's exclusions. *Vizcaino, supra,* 392 *N.J.Super.* at 370, 920 *A.*2d 754. Further,. Coregis continued to offer payment to PVSC for the defense of *Passaic II* during the pendency of the summary judgment proceedings. The initial offers were rejected by PVSC, and the parties ultimately agreed to a payment of $1.2 million. The parties agreed that the $1.2 million resolved all claims for

attorney's fees and defense costs associated with *Passaic II*. The record of expansive reservation letters coupled with a settlement of attorneys fees and defense costs makes an assertion of failure to defend ring hollow.

PVSC further claims that a breach of the policy may include a breach of the duty to act in good faith under *Fireman's Fund*, *supra*, 72 *N.J.* at 73, 367 *A.2d* 864. According to PVSC, such a breach exists where the insurer responds to a claim with unreasonable delay. *Ibid.* PVSC asserts that after issuing its first reservation of rights letter, Coregis did nothing in defense of PVSC, but instead sought summary judgment to disclaim coverage. PVSC's position is untenable, and is undermined by the abundance of correspondence proffered by Coregis and its ongoing efforts to resolve the cost of defense.[6]

The record is devoid of any factual basis to suggest that Coregis breached its duty to defend and we find no basis to apply the mandate of *Griggs, supra*, 88 *N.J.* at 364, 443 *A.2d* 163.

## IV.

Finally, we reject PVSC's assertions that it is entitled to fees and costs related to its declaratory judgment action against Coregis. Both the trial court and Appellate Division denied these claims.

*Rule* 4:42–9(a)(6) permits the award of attorney's fees "[i]n an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." The rule is intended "to discourage groundless disclaimers and to provide more equitably to an insured the benefits of the insurance contract without the necessity of obtaining a judicial determination that the insured, in fact, is entitled to such protection." *Sears Mortgage Corp. v. Rose*, 134

---

[6] We find no merit in PVSC's claim that its retention of counsel implicates a failure to defend. PVSC requested that Coregis allow it to retain counsel to defend, and Coregis agreed.

*N.J.* 326, 356, 634 *A.*2d 74 (1993) (quotation omitted). The award of counsel fees, however, is not mandatory, "but rather the trial judge has broad discretion as to when, where, and under what circumstances counsel fees may be proper and the amount to be awarded." *Iafelice ex rel. Wright v. Arpino,* 319 *N.J.Super.* 581, 590, 726 *A.*2d 275 (App.Div.1999); *see also N.J. Mfrs. Ins. Co. v. Consol. Mut. Ins. Co.,* 124 *N.J.Super.* 598, 600, 308 *A.*2d 76 (Law Div.1973) (stating that rule grants discretion to award costs "where the assured may have acted in bad faith and contributed substantially to the necessity for the litigation by reason of misrepresentations"). "Since equitable principles govern the trial court's decision, the court should consider the totality of the circumstances in awarding counsel fees." *Iafelice, supra,* 319 *N.J.Super.* at 591, 726 *A.*2d 275; *see also Enright v. Lubow,* 215 *N.J.Super.* 306, 313, 521 *A.*2d 1300 (App.Div.) (stating that "equitable principles must govern" the application of the *Rule* 4:42–9(a)(6)), *certif. denied,* 108 *N.J.* 193, 528 *A.*2d 19 (1987).

In considering this argument, we adhere to a standard of review that requires us to determine if either the Law Division or Appellate Division abused its discretion. *Packard–Bamberger Co. v. Collier,* 167 *N.J.* 427, 444, 771 *A.*2d 1194 (2001). Applying this discretionary standard, we conclude that the denial of fees and costs was not an abuse of discretion.

### V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Justices LaVECCHIA, RIVERA–SOTO, HOENS, CARCHMAN (temporarily assigned) and PARRILLO (temporarily assigned)—5.

*Not Participating*—Chief Justice RABNER and Justices LONG and ALBIN—3.