46 A.3d 525

MEMORIAL PROPERTIES, LLC AND MOUNT HEBRON CEMETERY ASSOCIATION, INC. D/B/A LIBERTY GROVE MEMORIAL PARK, PLAINTIFFS–APPELLANTS, v. ZURICH AMERICAN INSURANCE CO. D/B/A ZURICH NORTH AMERICA; ASSURANCE COMPANY OF AMERICA; AND MARYLAND CASUALTY COMPANY, DEFENDANTS–RESPONDENTS.

Argued January 30, 2012—Decided June 28, 2012.

514

*George T. Dougherty* argued the cause for appellants (*Katz & Dougherty*, attorneys).

*Benjamin A. Fleischner* argued the cause for respondents (*White Fleischner & Fino*, attorneys; *Adam P. Stark*, on the brief).

Justice PATTERSON delivered the opinion of the Court.

This insurance coverage dispute requires the Court to construe two insurance policies in litigation arising from the illegal harvesting of human remains. Plaintiffs Memorial Properties, LLC (Memorial) and Mount Hebron Cemetery Association (Mt. Hebron) are respectively the manager and owner of Liberty Grove Memorial Gardens (Liberty Grove), a New Jersey cemetery and crematory. Mt. Hebron was sued in 2007 and 2008 in seven lawsuits in the Superior Court of New Jersey and the Supreme Court of New York by family members of decedents whose remains were sent by funeral directors to Liberty Grove for cremation in 2003, 2004 and 2005. The New Jersey and New York plaintiffs alleged that prior to being sent to Liberty Grove, the decedents' bodies were unlawfully dissected, and that tissue, bone and organs were removed for commercial sale. The families contend that they did not discover the illegal harvesting scheme until 2006, when law enforcement officials who investigated and prosecuted the perpetrators advised them that their relatives' body parts had been illegally harvested.

Memorial and Mt. Hebron contend that they received the decedents' remains in closed containers and were unaware that the

remains had been tampered with before being turned over to the crematory. Memorial and Mt. Hebron were not prosecuted as a result of the criminal investigation of the illegal harvesting, and the claims against them in some of the cases brought by the decedents' families have been dismissed. However, they have incurred defense costs in the New Jersey and New York litigation.

This appeal arises from Memorial's and Mt. Hebron's pursuit of a defense and indemnification with respect to the New Jersey and New York litigation, under two insurance policies. The first policy, issued by Assurance Company of America (Assurance), provided coverage for the year 2003 for claims arising from damage to human remains and bodily injury, including mental anguish. The second, issued by Maryland Casualty Company (Maryland), provided analogous coverage for the year 2006, but contained an "improper handling" exclusionary clause, barring coverage for bodily injury or property damage arising from specified acts and omissions including "[f]ailure to bury, cremate or properly dispose of a 'deceased body.'" The insureds sought a declaratory judgment requiring Assurance and Maryland to defend and indemnify them in the New Jersey and New York lawsuits. The trial court granted summary judgment in favor of the defendant insurers, holding that neither insurance policy provided the coverage sought, and the Appellate Division affirmed.

We granted certification and now affirm. We hold that neither policy covers the claims asserted in the New Jersey and New York litigation against Memorial and Mt. Hebron. The Assurance policy does not cover the claims at issue because the New Jersey and New York plaintiffs seek damages for emotional distress resulting from their discovery in 2006 that their relatives' body parts had been illegally harvested. Accordingly, the relevant "occurrence" took place in 2006, outside of the policy period during which Assurance provided coverage to Memorial and Mt. Hebron. Additionally, the Maryland policy, which did provide coverage for 2006, included an "improper handling" exclusionary clause that clearly encompassed the relevant claims. Accordingly, the declar-

atory judgment action brought by Memorial and Mt. Hebron was properly dismissed by the trial court.

I.

The medical procedure known as allograft—the harvesting of human tissue, bone and organs from human bodies for transplant into living patients—may be conducted lawfully in New Jersey pursuant to the Revised Uniform Anatomical Gift Act, *N.J.S.A.* 26:6–77 to –96, and, prior to 2008, pursuant to the Uniform Anatomical Gift Act, *N.J.S.A.* 26:6–57 to –65 (repealed 2008).[1] The coverage issue before the Court arose from a scheme to harvest tissue, bones and organs from deceased individuals without the authorization required by law.

According to complaints filed by New Jersey and New York families of decedents whose remains were harvested, Michael Mastromarino, a New Jersey dentist, and Joseph Nicelli, a New Jersey "master embalmer," developed their plan to illegally obtain and sell body parts in about 2000. The plaintiffs allege that Mastromarino, Nicelli and their business, Biomedical Tissue Services, Ltd. (BMS), worked in conjunction with funeral homes and crematories to obtain access to human remains in those entities' custody. The families allege that following the deaths of their relatives on various dates in 2003, 2004 and 2005, Mastromarino and Nicelli extracted tissue, bones and organs from the remains without authorization, sometimes replacing harvested bone with polyvinyl chloride (PVC) piping so that the bodies would appear intact. They contend that Mastromarino and Nicelli falsified decedents' medical and funeral records to conceal the illegal

---

[1] The Revised Uniform Anatomical Gift Act sets forth the method by which a donor can make an "anatomical gift." *N.J.S.A.* 26:6–81. In cases in which a donor has not done so, the Act identifies the class of persons who can make an "anatomical gift" of the donor's remains. *N.J.S.A.* 26:6–85(a)(1). *N.J.S.A.* 26:6–58.5 was the sole provision of the Uniform Anatomical Gift Act that was amended and not repealed. *L.* 2008, *c.* 50, § 23.

tampering with the remains.[2]   The families allege that they were unaware of the harvesting until law enforcement authorities told them about it in 2006.

Memorial and Mt. Hebron consistently have denied involvement in the harvesting scheme.   Their representatives certified that, when they received bodies from funeral directors for cremation, the remains were already in sealed containers that were not opened by Memorial and Mt. Hebron prior to cremation, and that documentation accompanying the remains appeared proper.   According to Memorial and Mt. Hebron, they first learned of the illegal harvesting when they were contacted by New York law enforcement authorities in 2005.   They represented that they fully cooperated with law enforcement, and they were never charged with illegal activity in the criminal investigation of Mastromarino, Nicelli and the funeral directors alleged to have provided them with human remains.

Mt. Hebron, doing business as Liberty Grove, was named as a defendant in seven complaints, three filed in New Jersey and four in New York, along with Mastromarino, Nicelli, BMS and various funeral directors.   The claims asserted against Liberty Grove in two of the three New Jersey cases were dismissed early in the litigation.   In the remaining New Jersey case, brought by the family of a decedent who died in 2003, the plaintiffs filed a complaint against Liberty Grove alleging civil conspiracy, negligence, negligent infliction of emotional distress, breach of fiduciary duty, a violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –195, intentional and negligent misrepresentation, and common law fraud, and sought punitive damages.   The New York complaints, brought by families of decedents who died in 2003, 2004 and 2005, allege a "common undertaking" by all defendants. The plaintiffs sought to recover for negligence, intentional and

---

[2] Mastromarino pled guilty in New York and Pennsylvania and Nicelli pled guilty in New York to several crimes related to the body parts harvesting scheme. They were sentenced to prison terms.

negligent misrepresentation, intentional and negligent infliction of emotional distress, and a violation of the New York Consumer Protection Statute, N.Y. Gen. Bus. Law §§ 349 to 350–f–1, and demanded punitive damages.

In accordance with an Insuring Agreement that governed the Assurance and Maryland insurance policies, both policies provided coverage for "bodily injury" and "property damage." [3] "Bodily injury" is expressly defined to include claims for "mental anguish, mental injury, shock, fright or death resulting from bodily injury, sickness or disease." Both Insuring Agreements defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same harmful conditions." Under the Assurance policy, an "occurrence" must take place during the policy period—December 23, 2002, to December 23, 2003—to be covered. The Assurance policy's Cemetery Professional Liability endorsement provides for coverage for the following claims:

(1) bodily injury (including mental anguish) or property damage to which this insurance applies arising out of any malpractice, error or mistake committed by your cemetery operations.

(2) mental anguish arising out of the performance or non-performance of any contract made in the usual course of your cemetery operations for the care, burial or other disposition of a deceased human body, the conduct of memorial services or the transportation of a deceased human body by another, excluding, however, any specific agreement to pay for such mental anguish.

(3) property damage to deceased human bodies, the clothing or other personal effects or cremated remains, or to urns, caskets, cases, crypts, mausoleums or other property used for the care and burial of a deceased human body, owned by others and in your care, custody or control for the purpose of caring for or burying of a deceased human body.

The definition of "deceased human body" in the Assurance policy included "ashes of a deceased human body . . . and any part of a human body severed therefrom."

During the policy period of the Maryland policy, December 23, 2005, to December 23, 2006, all of the New Jersey and New York

---

[3] Memorial is a named insured in the Assurance and Maryland policies, and the Mt. Hebron/Liberty Grove cemetery property is identified as a covered property in both policies.

plaintiffs learned of the illegal harvesting of their relatives' tissue, bones and organs. Like the Assurance policy, the Maryland policy covered " 'bodily injury' or 'property damage' to which this insurance applies." However, the Cemetery Professional Liability endorsement in the Maryland policy expressly excluded from its coverage "[b]odily injury" or "property damage," arising out of "improper handling." That term is defined as follows:

(1) Failure to bury, cremate or properly dispose of a "deceased body" by any insured or anyone for whom the insured is legally responsible;

(2) Disarticulation of any part or parts from a "deceased body" by any insured or anyone for whom the insured is legally responsible;

(3) Distribution, sale, loaning, donating or giving away any part or parts of a "deceased body" by any insured or anyone for whom the insured is legally responsible;

(4) Any criminal act or other act prohibited by any law or ordinance committed by any insured or anyone for whom the insured is legally responsible regardless of whether there has been a criminal conviction or other adjudication or administrative ruling.

In 2008, Memorial and Mt. Hebron demanded that Assurance and Maryland defend and indemnify them in several of the New York and New Jersey cases. Assurance declined coverage on the ground that the occurrences were outside of the policy period, invoking plaintiffs' claims that they learned of the harvesting scheme in 2006. Maryland declined coverage, citing the "improper handling" exclusionary clause in its 2006 policy. The coverage dispute between Memorial and Mt. Hebron and the insurers gave rise to this litigation.

## II.

Memorial and Mt. Hebron filed a declaratory judgment action on May 14, 2008, naming as defendants Assurance, Maryland and Zurich North American Insurance Company (Zurich), and demanding defense and indemnification.[4] Following the removal of

---

[4] In the answer filed on behalf of Assurance, Maryland and Zurich, their counsel identified Zurich as "merely a trade style that has been employed by [Maryland]." That assertion has not been disputed by Memorial or Mt. Hebron.

the case to the United States District Court for the District of New Jersey and a subsequent remand from the District Court to the Superior Court of New Jersey, Law Division, Memorial and Mt. Hebron filed a motion for summary judgment, contending that as a matter of law the Assurance and Maryland policies provided coverage for the claims. Assurance and Maryland cross-moved for summary judgment. The trial court denied the summary judgment motion filed by Memorial and Mt. Hebron, but granted defendant insurers' cross-motion for summary judgment, identifying the year 2006 as the time frame of the "occurrence" in the two cases for which the insureds sought coverage. In that year, the trial court noted, the family members had discovered "that there has been this adulteration of the remains of loved ones." At that time, however, the trial court did not dismiss with prejudice the complaint against the defendants.

Memorial and Mt. Hebron filed a second motion for summary judgment, and filed a Second Amended Complaint in the trial court seeking a declaratory judgment ordering Maryland to defend and indemnify them in all seven of the family members' complaints pending in the courts of New Jersey and New York. Defendants cross-moved for summary judgment. In the cross-motions, the parties disputed the import of the "improper handling" exclusionary clause language in the Cemetery Professional Liability endorsement issued by Maryland for the 2006 policy period. Memorial and Mt. Hebron argued that the negligence claims asserted in the underlying litigation fell outside of the "improper handling" exclusionary clause, and that Maryland was therefore required to defend and indemnify Memorial and Mt. Hebron in all seven cases filed in New Jersey and New York. Maryland and the other insurers argued that the "improper handling" exclusionary clause encompassed all of the allegations against Memorial and Mt. Hebron in the seven complaints.

The trial court agreed with Maryland, ruling that although Memorial and Mt. Hebron were not alleged to have conducted the illegal harvesting, they were alleged to have "negligently cared for

corpses [and] conducted negligent cremation of corpses." The trial court considered this conduct to constitute a "failure to bury, cremate or properly dispose of a deceased body" within the meaning of the exclusionary clause. It accordingly denied the motion for summary judgment filed by Memorial and Mt. Hebron and granted the insurer-defendants' cross-motion for summary judgment.

An Appellate Division panel affirmed both of the trial court's orders granting the summary judgment motions filed by Assurance and Maryland. The panel held that Memorial and Mt. Hebron were not covered by the Assurance policy, because the "occurrence" for purposes of the policy "is not the time the wrongful act was committed but the time when the complaining party was actually damaged." The panel construed the claims of the decedents' family members to be rooted in "the harm to 'the personal feelings of the survivors,'" and accordingly concluded that the "occurrence" took place in 2006–outside of the policy period governing the Assurance policy.

The Appellate Division panel also affirmed the trial court's grant of summary judgment with respect to the Maryland policy. It found the New Jersey and New York claims brought by the family members of decedents to "stem[ ] directly" from conduct described in the "improper handling" exclusionary clause in the Maryland policy, and that the trial court properly held that Memorial and Mt. Hebron were not covered by the Maryland policy. We granted certification, 207 *N.J.* 188, 23 *A.*3d 413 (2011).

### III.

Memorial and Mt. Hebron contend that the Assurance policy requires Assurance to defend and indemnify them for claims asserted by the family members of decedents whose remains were illegally harvested in 2003. They contend that when the remains of the decedents were tampered with that year, both the acts giving rise to liability and the consequent damage occurred. Memorial and Mt. Hebron argue that any claim by the New

Jersey and New York plaintiffs for "mental anguish" suffered in 2006 derived from illegal acts committed in 2003. Memorial and Mt. Hebron also contend that the Appellate Division panel misconstrued the "improper handling" exclusionary clause in the Maryland policy covering occurrences in 2006, interpreting it to encompass ordinary negligence claims that do not involve the improper handling of human remains. They claim that the complaints pled both excluded and non-excluded claims, and that public policy and New Jersey case law compel the imposition of a duty to defend upon Maryland.

Assurance and Maryland argue that the New Jersey and New York claims sought damages for emotional distress, not for property damage. They contend that the operative "occurrence" was the discovery of the illegal harvesting of body parts in 2006, not the actual harvesting in 2003, and that the allegations arose from an "occurrence" outside the policy period of the Assurance coverage. Assurance and Maryland claim that the "improper handling" exclusionary clause in the Maryland policy includes both negligence and non-negligence claims asserted against Mt. Hebron and Liberty Grove. They claim that because all of the New Jersey and New York plaintiffs' claims are premised on a "failure to bury, cremate or properly dispose of a 'deceased body,'" the Appellate Division correctly applied that exclusionary clause to the entire litigation brought by the families of the affected decedents.

## IV.

Reviewing the trial court's grant of summary judgment, we " 'employ the same standard [of review] that governs the trial court.' " *Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 330, 9 *A.*3d 882 (2010) (quoting *Busciglio v. DellaFave*, 366 *N.J.Super.* 135, 139, 840 *A.*2d 897 (App.Div.2004)). We must view the evidence in the light most favorable to the non-moving party and analyze whether the moving party was entitled to judgment as a matter of law. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

■ Insurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement "will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello,* 202 *N.J.* 432, 441, 997 *A.*2d 991 (2010) (citing *Kampf v. Franklin Life Ins. Co.,* 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960)). The terms of insurance contracts are given their " 'plain and ordinary meaning,' " with ambiguities resolved in favor of the insured. *Ibid.* (quoting *Voorhees v. Preferred Mut. Ins. Co.,* 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992)); *see also Doto v. Russo,* 140 *N.J.* 544, 556, 659 *A.*2d 1371 (1995). Nonetheless, "courts cannot 'write for the insured a better policy of insurance than the one purchased.' " *Flomerfelt, supra,* 202 *N.J.* at 441, 997 *A.*2d 991 (quoting *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989)).

■ We construe the Assurance policy in accordance with those principles.[5] When parties dispute the identity of the operative "occurrence" for purposes of coverage, the actual damage to the party asserting the claim, not the wrongful act that precipitated that damage, triggers the "occurrence." As the Court held in *Hartford Accident,* construing a definition of "occurrence" similar to that at use here, the time of an "occurrence" within the meaning of an indemnity policy " 'is not the time the wrongful act was committed but the time when the complaining party was actually damaged.' " *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.,* 98 *N.J.* 18, 27–28, 483 *A.*2d 402 (1984) (quoting *Muller Fuel Oil Co. v. Ins. Co. of N. Am.,* 95 *N.J.Super.* 564, 578, 232 *A.*2d 168 (App.Div.1967)) (holding that date when plaintiff first exhibited signs of bodily injury constituted "occurrence," not when doctor administered injury-causing drugs).

Other cases interpreting the definition of "occurrence," analogous to the definition in the Assurance policy at issue here, have similarly determined that an "occurrence" takes place when the

---

[5] The parties acknowledge that New Jersey law governs the case.

actual damage occurs. *See, e.g., Yarrington v. Camarota,* 138 *N.J.Super.* 398, 402, 351 *A.*2d 353 (App.Div.1971) (finding no coverage when negligent construction occurred during policy period but fire causing damage occurred after), *aff'd,* 60 *N.J.* 169, 286 *A.*2d 711 (1972); *Deodato v. Hartford Ins. Co.,* 143 *N.J.Super.* 396, 402–03, 363 *A.*2d 361 (Law Div.1976) ("The occurrence in this instance is the destruction of the roof in June 1973. Although the negligence occurred when the roof was constructed in 1969, the mere negligent acts of plaintiff at that time did not constitute an 'occurrence.'"), *aff'd o.b.,* 154 *N.J.Super.* 263, 381 *A.*2d 354 (App. Div.1977). Thus, the "occurrence" takes place when the plaintiff's alleged damages are suffered.

■ In the sole New Jersey case filed against Mt. Hebron in which the harvesting occurred in 2003, the decedent's surviving spouse seeks damages for "severe pain and suffering, severe emotional distress and harm, [and] financial or economic loss," including lost wages. Her alleged damages derive from her distress upon learning of the unauthorized harvesting of her husband's tissue, bones and organs, and not from a purported cause of action based on property damage to her decedent's remains. Accordingly, in the New Jersey case in which the harvesting took place in 2003, the "occurrence" was the plaintiff-spouse's alleged emotional distress upon discovery of the harvesting scheme in a 2006 conversation with law enforcement, and her claim falls outside of the policy period set forth in the Assurance policy.

■ Even when a survivor is recognized to have a quasi-property right in the disposition of a decedent's remains, the damages available for a violation of that right derive from the wrongful infliction of emotional harm. *See Strachan v. John F. Kennedy Mem'l Hosp.,* 109 *N.J.* 523, 531, 538 *A.*2d 346 (1988) (recognizing quasi-property right to proper burial, and allowing for recovery of damages based on emotional distress); *Spiegel v. Evergreen Cemetery Co.,* 117 *N.J.L.* 90, 93, 186 *A.* 585 (Sup.Ct. 1936) (recognizing right to bury dead as quasi-property right, and

finding that failure of cemetery company to bury plaintiffs' deceased father in presence of family members in accordance with agreement rendered company liable for plaintiffs' mental or emotional distress).

The claims brought by two New York families whose decedents' remains were illegally dissected in 2003 also fall outside the Assurance policy period. The damages claimed are described only generally in the families' complaints, but they would similarly derive from the survivors' belated discovery, in 2006, of the harvesting activity that had occurred years before, and their emotional distress as a result of that discovery. Under New York law, the family of a deceased person whose remains are mishandled can assert a cause of action for emotional distress. *See, e.g., Dixon v. City of New York,* 76 *A.D.*3d 1043, 908 *N.Y.S.*2d 433, 433 (2010). New York also recognizes a "right of sepulcher," derived from "[t]he ancient concept that every person is entitled to a proper burial." *Melfi v. Mount Sinai Hosp.,* 64 *A.D.*3d 26, 877 *N.Y.S.*2d 300, 305 (2009). As one court explained:

> [W]e find that for a right of sepulcher claim to accrue (1) there must be interference with the next of kin's immediate possession of decedent's body *and* (2) the interference has caused mental anguish, which is generally presumed. Interference can arise either by unauthorized autopsy or by disposing of the remains inadvertently or, as in this case, by failure to notify the next of kin of the death. The next of kin's mental anguish in these situations is then generally presumed but, in any event, cannot be felt until the next of kin is aware of the interference with his/her right of possession of the loved one's body for burial.
> [*Id.* at 309 (internal citations omitted).]

Like emotional distress damages, damages for violation of the right of sepulcher are rooted in the harm suffered by a family member who becomes aware that his or her decedent's remains have been tampered with or disposed of without permission.

Accordingly, the "occurrence" relating to the New Jersey and New York plaintiffs' causes of action took place when they learned of the harvesting of their decedents' body parts in 2006, not in 2003 when that harvesting took place. The trial court properly determined that Memorial and Mt. Hebron were not entitled to coverage under the Assurance policy.

## V.

■ The Maryland policy, in effect in 2006, raises a separate issue. Its exclusionary clause disclaimed coverage for claims based upon such activities conducted "by any insured or anyone for whom the insured is legally responsible" including "disarticulation" of body parts from a deceased body, "distribution, sale, loaning, donating or giving away" parts of a deceased body, and any criminal act. The parties dispute the impact of the exclusionary clause upon the claims at issue here.

■ Exclusionary clauses are presumed valid if they are " 'specific, plain, clear, prominent and not contrary to public policy.' " *Princeton Ins. Co. v. Chunmuang*, 151 *N.J.* 80, 95, 698 *A.*2d 9 (1997) (quoting *Doto, supra*, 140 *N.J.* at 559, 659 *A.*2d 1371). They are typically construed narrowly with the onus " 'on the insurer to bring the case within the exclusion.' " *Flomerfelt, supra*, 202 *N.J.* at 442, 997 *A.*2d 991 (quoting *Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 155 *N.J.* 29, 41, 713 *A.*2d 1007 (1998)). If the terms used in an exclusionary clause are ambiguous, "courts apply the meaning that supports coverage rather than the one that limits it." *Ibid.* However, "[i]f the words used in an exclusionary clause are clear and unambiguous, 'a court should not engage in a strained construction to support the imposition of liability.' " *Ibid.* (quoting *Longobardi v. Chubb Ins. Co. of N.J.*, 121 *N.J.* 530, 537, 582 *A.*2d 1257 (1990)); *see also Cobra Prods., Inc. v. Fed. Ins. Co.*, 317 *N.J.Super.* 392, 400-01, 722 *A.*2d 545 (App.Div.1998) (noting that not every "far-fetched interpretation of a policy will be sufficient to create an ambiguity requiring coverage" (quotation omitted)), *certif. denied*, 160 *N.J.* 89, 733 *A.*2d 494 (1999).

The exclusionary clause in this case plainly encompasses all of the claims asserted against Memorial and Mt. Hebron. The conduct of which Mt. Hebron and Liberty Grove are accused—participation in a common undertaking to dissect and remove body parts from the decedents without legal authorization—falls squarely within the parameters of the clause. Notwithstanding the assertion by Memorial and Mt. Hebron that an unspecified

charge of "non-handling negligence ... consistent with the statutory limitations on a cemetery's role in the death care industry" can be inferred from the complaints, none of the New Jersey or New York causes of action can be construed to be independent of the illegal harvesting allegations. Accordingly, Memorial and Mt. Hebron are not entitled to coverage under the Maryland policy.

Memorial and Mt. Hebron contend that Maryland has a duty to defend both "covered and excluded theories of recovery." The duty to defend and the duty to indemnify are distinct; an insurance company's duty to defend "is neither identical nor coextensive" with its duty to indemnify. *Flomerfelt, supra,* 202 *N.J.* at 444, 997 *A.*2d 991. The duty to defend "comes into being when the complaint states a claim constituting a risk insured against." *Voorhees, supra,* 128 *N.J.* at 173, 607 *A.*2d 1255 (quoting *Danek v. Hommer,* 28 *N.J.Super.* 68, 77, 100 *A.*2d 198 (App.Div.1953), *aff'd o.b.,* 15 *N.J.* 573, 105 *A.*2d 677 (1954)). Even if the allegations, tested in discovery and at trial, turn out to be "groundless, false or fraudulent," the insurer has a duty to defend. *Ohio Cas. Ins. Co. v. Flanagin,* 44 *N.J.* 504, 512, 210 *A.*2d 221 (1965). The duty to defend would thus be triggered by the presence of a covered claim in a complaint filed against the insured.

There is no such covered claim in this case. The New Jersey and New York complaints allege that Mt. Hebron and Liberty Grove (1) knowingly allowed Mastromarino and others to have access to the decedents' remains; and (2) were negligent in their care of the decedents' remains, thus permitting those individuals to gain access to the remains. The first of those theories alleges an active role by Memorial and Mt. Hebron in the harvesting scheme, and therefore falls squarely within the parameters of the exclusionary clause. That cause of action is plainly excluded from coverage under the Maryland policy.

The second theory is similarly included within the exclusionary clause. Failure to take reasonable care to ensure that the decedents' remains stayed intact until cremation, if proven, would

constitute "failure to bury, cremate or properly dispose of a 'deceased body.'" Accordingly, if the alleged injury to the surviving family members is damage "arising out of" Mt. Hebron's or Liberty Grove's failure to use reasonable care to ensure the proper disposition of the decedents' remains, it falls within the exclusionary clause. The term "arising out of" is defined as "'originating from,' 'growing out of,' or having a 'substantial nexus.'" *Am. Motorists, supra,* 155 *N.J.* at 35, 713 *A.*2d 1007 (quoting *Records v. Aetna Life & Cas. Ins.,* 294 *N.J.Super.* 463, 468, 683 *A.*2d 834 (App.Div.1996), *certif. denied,* 151 *N.J.* 463, 700 *A.*2d 876 (1997)). If, as is alleged by the families of decedents, negligence in the care and custody of the decedents' remains exposed those remains to illegal harvesting, then the emotional harm consequently inflicted upon the families would "arise out of" Mt. Hebron's or Liberty's negligence in failing to "properly dispose" of their decedents' bodies. Accordingly, all of these plaintiffs' causes of action are within the parameters of the exclusionary clause, and Maryland had neither a duty to defend nor a duty to indemnify in this case.

## VI.

The trial court and Appellate Division properly held that neither the Assurance policy nor the Maryland policy requires the insurer to defend or indemnify Memorial and Mt. Hebron. The judgment of the Appellate Division is affirmed.

Chief Justice RABNER and Justices LaVECCHIA, ALBIN, and HOENS; and Judge WEFING (temporarily assigned) join in Justice PATTERSON's opinion.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.