**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3554-17T2

MARITIME PARK, LLC,
a/k/a MARITIME PARC, LLC,
a New Jersey limited liability
corporation, d/b/a MARITIME
PARC,

     Plaintiff-Appellant,

v.

NOVA CASUALTY COMPANY,

     Defendant-Respondent.

_____

Submitted March 11, 2019 – Decided March 29, 2019

Before Judges Sabatino and Mitterhoff.

On appeal from Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-000024-16.

Lee Law Firm, LLC, attorneys for appellant (Edward H. Lee, on the brief).

LeClair Ryan, PC, attorneys for respondent (John P. Malloy, on the brief).

PER CURIAM

Plaintiff is the owner of a restaurant in Liberty State Park that was temporarily closed for several weeks after Superstorm Sandy. Although plaintiff's insurer paid it for certain losses stemming from the closure, plaintiff sought additional coverage benefits under a "civil authority" provision set forth in the insurance policy.

The trial court denied plaintiff's claims for such additional benefits, construing the policy language to disallow coverage under the factual circumstances presented. Plaintiff now appeals that ruling.

For the reasons that follow, we affirm.

I.

A.

Plaintiff's Restaurant and Its Location Within Liberty State Park

Maritime Park, LLC is the owner of Maritime Parc ("Maritime") a self-described "high-end" restaurant on Audrey Zapp Drive within Liberty State Park in New Jersey. The restaurant is located on the waterfront within the Park in an area known as the Liberty Landing Marina. The Marina is situated on the Hudson River and has over 500 in-water boat slips, in addition to above-ground dry dock storage. Two restaurants are located within the Marina area: Maritime

2

and Liberty House. Maritime and Liberty House are adjacent to each other and share a parking lot.

B.
Superstorm Sandy and the DEP Closure Order

On October 28, 2012, at approximately 3:00 p.m., the Commissioner of the New Jersey Department of Environmental Protection ("DEP") issued an order closing the Park in anticipation of Superstorm Sandy. Superstorm Sandy made landfall in New Jersey the following day on October 29. Robert Rodriguez, the Park's area manager during the time and current its superintendent, testified that all buildings within the Park were closed pursuant to the DEP's order. In addition, police blocked access to the Park.

As a result of Superstorm Sandy, the Park remained closed to the public until November 16, 2012.[1] In response to Maritime's request for information to facilitate its insurance claim, Rodriguez described the damage[2] to the Park in a January 14, 2015 letter as follows:

> The Park roads, specifically Audrey Zapp Drive, Morris Pesin Drive and Freedom Way were closed at

---

[1] The record is inconsistent about this Park reopening date, but was clarified by Rodriguez during his deposition. We adopt the November 16 date utilized by the motion judge in his opinion.

[2] The letter also described damage to other areas of the Park that are not relevant to the case at bar.

> interval times due to flooding and debris. <u>Floodwaters and force winds carried and deposited debris all over the [P]ark but especially on the roads of the [P]ark.</u> Debris included boats and yachts, trees, garbage of varying types, paverstones, chemicals and building materials. Some of the debris included vegetative but also household waste such as furniture, outdoor backyard equipment, playground equipment, computers, chairs, clothing, etc. <u>It took a considerable amount of time to allow for the flood waters to recede (approx., 2-3 weeks) and to remove the debris from the roads.</u> Debris removal from [the Park] amounted to over 1,000 tons. Audrey Zapp Drive was reopened to the public and vehicles on November 16, 2012.
>
> [(Emphasis added).]

Rodriguez explained in his deposition that the rising flood waters moved boats from the Marina to other areas of the Park. Rodriguez specifically recalled seeing "boats across the street from the Marina, on Audrey Zapp Drive." He also recalled seeing "a really large piece of a barge" on "Johnson Avenue, [a roadway which] turns into Audrey Zapp Drive." Rodriguez recalled Audrey Zapp Drive "being under water for days, maybe even a week or two."

In his January 14, 2015 letter, Rodriguez detailed the post-storm damage to the sewer system that services the Marina, Maritime, and Liberty House. According to his letter, the "electrical and mechanical systems that service the sewage system . . . [were] damaged from flooding and wind. For several weeks the sewage system was inoperable[,] forcing all employees to utilize pot-a-sans

toilets." According to Rodriguez, the damage to the sewer system was the result of "a combination" of flooding and wind.

On November 19, 2012, power was restored to Maritime.[3] Maritime alleges that after the Park reopened, its hours of operation were curtailed. According to Maritime, the Park was only open "from 6:00 a.m. until dusk." Maritime maintains that "having to close [its] property at dusk in November and December of 2012, when it gets dark at approximately 5:00 p.m. – 6:00 p.m., does not make for a profitable dinnertime at a restaurant on the Hudson River."

## C.
### Maritime's Insurance Policy

During the relevant time frame, Maritime was insured by defendant Nova Casualty Company ("Nova" or "the insurer") under a policy with an inception date of November 24, 2011, and an expiration date of November 24, 2012. Several different portions of Maritime's insurance policy are implicated in this case.

---

[3] Marc Haskell, one of the owners of Maritime, testified that he recalled reopening the restaurant "after Thanksgiving" on either "November 29 or November 30." According to his recollection, Maritime opened after Thanksgiving because the restaurant did not have full power, the sewer system was not working, and the Park was not yet open. However, during this litigation, Maritime admitted in a counterclaim answer that its power was restored before Thanksgiving, on November 19, 2012.

## 1.
## Utility Services

The utility services provision is part of the "Restaurant Enhancement" endorsement included in the Policy. Subsection "u" of the endorsement states:

> u. Utility Service
>
> (1) We will pay for loss or damage caused directly or indirectly by the failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the premises and the failure does not result in a Covered Cause of Loss.
>
> (2) The most we will pay for loss or damage under this coverage is $100,000 in any one occurrence, unless a different limit is shown for Utility Service in the Supplemental Schedule. Coverage begins 24 hours after the failure of the utility service commences.

Nova paid $82,318 to Maritime under this provision. The loss period ran from October 31, 2012 (twenty-four hours after power service was interrupted) until November 18, 2012 (since power was restored the next day on November 19, 2012).

A-3554-17T2

## 2.
## Civil Authority

The Civil Authority provision is included in the "Business Income" provision of the Policy. Under subsection 5 of this provision, titled "Additional Coverages," the Policy provides:

a. Civil Authority

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

7

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

> (1) Four consecutive weeks after the date of that action; or

> (2) When your Civil Authority Coverage for Business Income ends; whichever is later.

[(Emphasis added).]

Under the civil authority provision, the prohibition on access to the property experienced by the insured must be the result of damage caused by a "covered cause of loss." The introductory words of the provision notably state, "When a <u>covered cause of loss</u> causes damage . . . ." (Emphasis added).

The Policy defines, in turn, the pivotal concept of a "Covered Causes of Loss" as:

> A. Covered Causes of Loss
>
> When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss <u>unless the loss is</u>:
>     1. <u>Excluded in Section B.</u>, Exclusions; or
>     2. Limited in Section C., Limitations.

[(Emphasis added).]

A-3554-17T2

## 3.
## Water Exclusion

Section B of the Policy delineates the types of claims that are excluded from the Policy.  Among other things, Section B provides in pertinent part:

B.  Exclusions

1. We will <u>not pay</u> for loss or damaged <u>caused directly or indirectly</u> by <u>any</u> of the following. <u>Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss</u>.

[(Emphasis added).]

One of the exclusions listed under Section B is for "water."  That term is described in the water exclusion endorsement, as follows:

B. Water

(1)  <u>Flood, surface water</u>, waves (including tidal wave and tsunami), tides, tidal water, <u>overflow of any body of water</u>, or spray from any of these, <u>all whether or not driven by wind (including storm surge)</u>;

(2)  Mudslide or mudflow;

(3)  <u>Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment</u>;

(4) Water under the ground surface pressing on, or flowing or seeping through:

A-3554-17T2

(a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings; or

(5) <u>Waterborne material carried or otherwise moved by any of the water</u> referred to in Paragraph 1., 3. or 4., or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs 1, through 5, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, sea-wall or other boundary or containment system fails in whole or in part, for any reason, to contain the water. . . .

[(Emphasis added).]

D.
Maritime's Coverage Claims

Although it sustained other forms of physical damage from the storm, Maritime suffered no water damage or flooding in the interior of its building. Haskell, who checked on the restaurant two days after the storm had passed, testified that "most of the damage was contained to the exterior of the building and exterior patio area." Haskell stated most of the physical damage occurred to Maritime's outdoor patio, which contained an outdoor bar and seating. Meanwhile, Nova described the damage as "relatively minor wind damage and the loss of electrical power."

A-3554-17T2

After the storm, Maritime retained the services of a licensed public insurance adjuster, who filed a property insurance claim on its behalf with Nova for "losses of business personal property and business income and extra expenses as such losses are defined in said policy of insurance." The claim was categorized under the policy category of "wind and hail" and was described as "Hurricane Sandy – Wind/water damage to insured location."

Upon investigating the claim, Nova determined that Maritime sustained wind damage, and loss of electrical power from October 29 to November 19, 2012 which resulted in Maritime being unable to operate. Nova consequently paid Maritime the following sums on portions of its claims: $25,000 for food spoilage; $63,111.24 for damage to property; and the aforementioned $82,318 for loss of business income and extra expense under the "utility services" portion of the Policy.

Maritime originally claimed an aggregate loss of business income of $385,226.08. Therefore, it maintained that the $82,318 payment by Nova for lost income was insufficient. Pursuant to a procedure set forth in the Policy, Maritime requested an appraisal of this business income claim.[4]

---

[4] As described by Nova, "[u]nder this process, Maritime and Nova each select an appraiser. The two appraisers then select a neutral third appraiser, to comprise a panel of three. A decision by two of the three appraisers on the

The parties disagreed over the appropriate scope of an appraisal. Nova maintained that Maritime was entitled to coverage only for the loss of income under the utility service provision, i.e., for loss associated with the loss of electrical power to the restaurant. Therefore, Nova sought to limit the appraisal to the issue of the amount of income lost during the specific period the restaurant was without power. Maritime disagreed with that scope, contending that it was separately entitled to coverage for loss of business income under the Civil Authority provision. Nova had denied coverage under that provision, finding it inapplicable.

E.
The Litigation

In March 2016, Maritime filed a complaint in the Chancery Division against Nova to pursue its claims for additional coverage. The complaint sought, among other things, a declaratory judgment that Nova was required to proceed to an appraisal on Maritime's claim for civil authority coverage.[5] Nova denied

amount of the loss is binding as to the amount of loss, but not whether coverage exists."

[5] The complaint also includes counts for: judgment declaring Maritime's claim for business income and extra expense are insured under the Policy (second count); violation of N.J.S.A. 56:8-2, the Consumer Fraud Act (third count); and breach of the implied duty of good faith and fair dealing (fourth count). Maritime does not appeal from the entry of summary judgment on these claims,

12

liability, and asserted a counterclaim seeking a judicial declaration that the utility services portion of the policy was the only portion subject to an appraisal.

## F.
### The Motion Practice

Nova moved for summary judgment, and Maritime cross-moved for summary judgment. Both parties agreed the factual record did not require any further development in order to resolve the coverage issues.

After hearing oral argument, Judge Arnold L. Natali, Jr., granted Nova's motion for summary judgment, and denied plaintiff's motion. The judge expressed his reasons in a detailed oral decision dated February 28, 2018. In particular, Judge Natali determined that Maritime was not entitled to coverage under the Civil Authority provision of the Policy.

This appeal followed.

## II.

On appeal, Maritime argues the trial court erred in rejecting its claim for additional coverage under the insurance policy's Civil Authority provision. We consider that argument de novo because the interpretation of an insurance policy

---

as its appellate brief contains no argument challenging the trial court's decision on these counts. See R. 2:6-2(a); see also Morris v. T.D. Bank, 454 N.J. Super. 203, 206 n.2 (App. Div. 2018) ("An issue that is not briefed is deemed waived upon appeal.").

A-3554-17T2

provision, and its application to record facts, is essentially a legal analysis. See, e.g., Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 428 (App. Div. 2004) ("[T]he interpretation of an insurance contract is a question of law which we decide independent of the trial court's conclusions.").

The insurance contract is "construed in accordance with principles that govern the interpretation of contracts." Mem'l Properties, LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 525 (2012). Accordingly, an insurance policy will be enforced as written when its terms are clear and unambiguous. Simonetti, 372 N.J. Super. at 428. "If the plain language of the policy is unambiguous, we will 'not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased.'" Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016) (quoting Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008)). In addition, we afford no special deference to a trial court in reviewing a decision rendered on summary judgment. W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012).

Having applied these principles here, we affirm the trial court's summary judgment ruling, substantially based upon the well-reasoned oral opinion of Judge Natali. We add only a few comments by way of amplification.

Succinctly stated, the Policy furnishes Civil Authority coverage when: (1) a "covered cause" of loss causes damage; (2) the damage is to property at a location other than the insured location, but located within a mile of it; and (3) the action of a civil authority prohibits access to the described premises. For purposes of the coverage analysis, Maritime argues that the act of "civil authority" here is the DEP Commissioner's October 28, 2012 order closing the Park in anticipation of Superstorm Sandy.

As the motion judge correctly recognized, even if the Commissioner's closure order restricting access to the Park due to the storm is deemed a cause of Maritime's loss of business revenue, Maritime cannot be paid under the Civil Authority provision unless the circumstances involve a "covered claim of loss."

As we have highlighted above, the Policy's definition of a "covered claim of loss" contains various exclusions in Section B that operate to nullify coverage. In particular, the Policy makes clear that Nova "will <u>not pay</u> for loss or damage caused directly or indirectly" by any of Section B's listed exclusions, including water infiltration, sewage back-up or overflow and waterborne material that has been carried or moved. (Emphasis added).

Importantly, the Policy states "[s]uch loss or damage is excluded regardless of any causes or events that constitutes concurrently or in any

sequence to the loss." This language is commonly known as an "anti-concurrent causation clause." The clause bars coverage when two identifiable causes – one covered and one not covered – contributes to a single loss. See, e.g., Wear v. Selective Ins. Co., 455 N.J. Super. 440, 454-55 (App. Div. 2018) (enforcing such an anti-concurrent causation clause); Simonetti, 372 N.J. Super. at 431 (same); see also Assurance Co. of Am., Inc. v. Jay-Mar, Inc., 38 F.Supp.2d 349, 352-54 (D.N.J. 1999) (same).

Judge Natali correctly applied the Policy's anti-concurrent causation clause in this case. The record clearly shows that one of the reasons the Park was kept closed for several weeks – if not the sole reason – was the flood waters that overflowed portions of the Park. This was confirmed by Rodriguez's January 2015 letter, as well as his subsequent deposition testimony. The flood waters, combined with wind and other factors, caused debris to be moved about the Park, including large objects on Audrey Zapp Drive that impeded safe access to Maritime.

It is inconsequential that Maritime's property itself was not damaged by flooding. Due to the anti-concurrent cause provision, the Civil Authority language affords no coverage where the restrictions on Park access were produced, at least in part, by flooding. Moreover, it is immaterial that the Park

was not actually flooded when it closed in anticipation of the storm on October 28. The Civil Authority provision specifically provides that coverage begins only "72 hours <u>after</u> the time of the first action of civil authority that prohibits access to the described premises." (Emphasis added).

Because the terms of the Policy language are clear and ambiguous, the trial court appropriately did not "engage in a strained construction to . . . write a better policy for the insured than the one [Maritime] purchased." <u>Templo Fuente De Vida Corp.</u>, 224 N.J. at 200.

The remaining arguments raised by Maritime on appeal lack sufficient merit to warrant any further comment. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3554-17T2