**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3029-22

BASF CATALYSTS, LLC, f/k/a
ENGELHARD CORPORATION,

    Plaintiff-Appellant/Cross-
    Respondent,

v.

ALLSTATE INSURANCE
COMPANY, as successor-in-interest
to NORTHBROOK EXCESS &
SURPLUS LINES INSURANCE
COMPANY, CONTINENTAL
INSURANCE COMPANY,
EVEREST REINSURANCE
COMPANY, as successor-in-interest
to PRUDENTIAL REINSURANCE
COMPANY, FEDERAL INSURANCE
COMPANY, GREAT NORTHERN
INSURANCE COMPANY,
HARTFORD ACCIDENT &
INDEMNITY COMPANY,
LEXINGTON INSURANCE COMPANY,
NEW JERSEY MANUFACTURERS
INSURANCE COMPANY, as successor-in-
interest to NEW JERSEY MANUFACTURERS
CASUALTY COMPANY, NEWARK
INSURANCE COMPANY, ONEBEACON
AMERICA INSURANCE COMPANY,

as successor-in-interest to COMMERCIAL UNION INSURANCE COMPANY AND EMPLOYERS LIABILITY ASSURANCE CORPORATION, ROYAL INDEMNITY COMPANY, ROYAL INSURANCE COMPANY OF AMERICA, as successor-in-interest to ROYAL INSURANCE COMPANY AND ROYAL GLOBE INSURANCE COMPANY, TRAVELERS CASUALTY & SURETY COMPANY, as successor-in-interest to AETNA CASUALTY & SURETY COMPANY, and certain underwriters at LLOYD'S AND BRITISH COMPANIES,

     Defendants,

and

UNITED STATES FIRE INSURANCE COMPANY,

     Defendant-Respondent/Cross-Appellant.

_____

> Argued March 24, 2025 – Decided May 2, 2025
>
> Before Judges Sabatino, Berdote Byrne, and Jablonski.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2061-05.
>
> Eugene Killian, Jr., argued the cause for appellant/cross-respondent (Killian Firm, PC, and David G. Oberdick (Meyer, Unkovic & Scott, LLP) of the Pennsylvania bar, admitted pro hac vice, and Andrew L. Noble (Meyer, Unkovic & Scott, LLP) of the Pennsylvania bar, admitted pro hac vice, attorneys;

2

Eugene Killian, Jr., Dimitri Teresh, David G. Oberdick, and Andrew L. Noble, of counsel and on the briefs).

Gary S. Kull and Katrine L. Hyde argued the cause for respondent/cross-appellant (Kennedys CMK LLP, attorneys; Gary S. Kull, Katrine L. Hyde, and Tyler J. Pierson, of counsel and on the briefs).

PER CURIAM

In this environmental insurance litigation that stretches back two decades, a policyholder appeals, and an excess insurer cross-appeals, various rulings of the trial court. The rulings concern the allocation of coverage under Massachusetts law, prejudgment interest, counsel fees, and costs. We affirm as to both the appeal and cross-appeal.

I.

The complicated extensive background of this matter is familiar to the parties, and we need not describe it at length here. The following summary will suffice for the purposes of this opinion.

The case involves a twenty-two-acre industrial site in Plainville, Massachusetts, on which plaintiff BASF Catalysts, LLC ("BASF"), formerly known as Engelhard Corporation,[1] operated a metal fabrication, processing, and

---

[1] For simplicity, we refer to plaintiff throughout this opinion as BASF rather than Engelhard.

finishing plant. Operations at the Plainville facility began in 1957. They primarily involved rolling and fabricating steel and titanium and also included fabricating uranium fuel elements under a license with the government. Nuclear manufacturing at the facility ceased in 1962.

After 1963, the operations conducted at the facility changed. The facility was expanded through the construction of adjoining buildings, eventually covering a contiguous area of approximately 300,000 square feet, consisting of twelve buildings, in which gold and silver wire and stock for the jewelry and electronic industries were manufactured.

Operations at the facility ceased in 1993. After a five-year hiatus, limited operations re-commenced in 1999.

The nuclear and non-nuclear operations at the site resulted in environmental contamination, specifically contamination of groundwater, surface water, soils, and sediments at and around the facility. The primary contaminants of concern in the groundwater are chlorinated volatile organic compounds ("CVOCs"), primarily perchloroethylene, trichloroethylene, and trichloroethane.[2]

---

[2] In addition, the soil and sediments at the Plainville facility have been contaminated by radionuclides, heavy metals, and polychlorinated biphenyls

A-3029-22

After investigation by environmental regulators, BASF was required to undertake various on-site and off-site remediation measures. BASF sought to recover those costs from the fifteen insurance companies that had issued, at various times, comprehensive general liability ("CGL") policies to BASF.

One of the insurers was defendant United States Fire Insurance Company ("US Fire"). US Fire issued an umbrella policy to BASF for three years, covering the period from February 26, 1970, to February 26, 1973.

In March 2005—twenty years ago—BASF filed a complaint in the Law Division against the fifteen insurers, including US Fire, seeking coverage for the environmental cleanup costs at the Plainville site. Over time, all the insurers except for US Fire were either dismissed or entered into settlements with BASF.

The trial court ruled that substantive Massachusetts law applies to the allocation issues in this case. US Fire did not appeal that choice-of-law determination.

A Law Division judge ("the first judge") tried the case from October 2010 to January 2011 in a non-jury proceeding. The first judge concluded that BASF

---

("PCBs"). However, the trial court eventually determined that the radionuclide, metal, and PCB contamination was confined to on-site soils and sediments and had not migrated off-site. Consequently, the trial court concluded that coverage for remediation of those particular contaminants was excluded under the owned-property exclusion within the relevant insurance policies.

A-3029-22

was entitled overall to approximately $12.8 million in coverage for past remediation costs. The first judge also concluded that BASF was entitled to coverage for certain future remediation costs yet to be incurred.

The first judge appointed a former jurist as Special Allocation Master ("SAM")[3] to ascertain the portions of liability for BASF and each of the remaining insurers, including US Fire.

After extensive hearings, the SAM issued his report and recommendations on August 3, 2015. The SAM chose to apply what he regarded as a "fact-based" method for allocating the coverage rather than the so-called "time-on-the-risk" method. Applying that method, the SAM found that 25.84% of BASF's pre-2010 remediation costs were payable by US Fire. US Fire filed exceptions with the Law Division, contending its appropriate share was less than 7%.

In June 2018 a different Law Division judge ("the second judge") adopted the SAM's allocation. US Fire moved for reconsideration. After a long delay, the second judge issued a written decision on July 30, 2020. The second judge granted US Fire's motion for reconsideration, finding that his earlier adoption of

---

[3] Although the Supreme Court recently adopted the term "Special Adjudicator" to replace "Special Master," we shall nonetheless use the acronym SAM in this opinion, consistent with the various decisions and briefs. The SAM is now deceased.

the SAM's recommendations was "palpably incorrect."  This time, the second judge applied the "time-on-the-risk" allocation method, which reduced US Fire's liability.  The second judge also extended the end date for the allocation period from December 31, 2009, to January 31, 2011.

Based on the second judge's reconsideration analysis, BASF was awarded a final judgment against US Fire of $2.6 million.  The judgment was entered by a third Law Division judge ("the third judge"), who succeeded the second judge after the latter's retirement.  That final judgment included an award to BASF for counsel fees and costs as well as prejudgment interest with a 2% discretionary enhancement permitted under the court rules.  It also declared U.S. Fire responsible for 6.4% of covered costs incurred after December 31, 2018.

BASF appeals the second judge's grant of reconsideration and seeks to restore the SAM's allocation determination.  US Fire, meanwhile, cross-appeals the counsel fee award, arguing that BASF is not a "prevailing party" eligible for fee-shifting because the final monetary outcome was much less than BASF had originally sought in the case.  The parties also raise other issues, such as the designation of the contamination "end date," the enhanced interest award, and other matters.

II.

A.

As we noted above, the allocation issues in this case are governed by Massachusetts law. The parties agree the seminal Massachusetts precedent that controls here is <u>Boston Gas Co. v. Century Indemnity Co.</u>, 910 N.E. 2d 290 (Mass. 2009) ("<u>Boston Gas I</u>").

In <u>Boston Gas I</u>, the United States Court of Appeals for the First Circuit certified the following questions to the Supreme Judicial Court of Massachusetts ("SJC"):

> 1. Where an insured protected by standard CGL[*] policy language incurs covered costs as a result of ongoing environmental contamination occurring over more than one year and the insurer provided coverage for less than the full period of years in which contamination occurred, should the direct liability of the sued insurer be pro rated in some manner among all insurers 'on the risk,' limiting the direct liability of the sued insurer to its share but leaving the insured free to seek the balance from other such insurers?
>
> 2. If some form of pro rata liability is called for in such circumstances, what allocation method or formula should be used?
>
> . . . .
>
> [*] The acronym "CGL," which prior to 1986 stood for "comprehensive general liability," now stands for "commercial general liability." <u>See</u> 9A G. Couch,

8

[Insurance] § 129:1, at 129-5 (3d ed. 2005). The policies at issue in this case, which were written long before 1986, are "comprehensive" general liability policies. We shall use the acronym, "CGL," to refer to the policies at issue here. "[CGL] policies are designed to protect the insured against losses to third parties arising out of the operation of the insured's business." Id. at § 129:2, at 129-7.

[910 N.E.2d at 292-93 (quoting Boston Gas Co. v. Century Indem. Co., 529 F.3d 8, 24 (1st Cir. 2008)).]

The SJC summarized the factual background in Boston Gas I, which in some respects parallels the present case, as follows:

> Boston Gas produced gas fuel at facilities called manufactured gas plants (MGPs). The MGPs created gas by heating coal in large ovens, generating gas that was then purified and piped out for use. This process produced a variety of byproducts, including ash, drip oil, tar, and coke. Many of these byproducts are nonbiodegradable and some are deemed carcinogenic. These byproducts now contaminate the ground and water around many former MGP sites. . . . This case concerns only one [site], located in Everett.
>
> Boston Gas operated the Everett MGP from 1908 until about 1969. . . In 1995, a routine investigation uncovered contamination at the Everett site. The primary contaminant in this case was tar, which is the main liquid byproduct of manufactured gas production. Although the site had been sold to a new owner . . . Boston Gas [nonetheless] was strictly liable under Massachusetts law for all costs associated with the investigation and cleanup of the contamination caused by the Everett MGP's operations.

A-3029-22

[Id. at 293-94.]

In 1995, after it had investigated and begun the cleanup of the Everett site, Boston Gas placed its insurer, Century Indemnity Company ("Century"), on notice that the company might seek indemnification for the costs associated with its investigation and cleanup of the contaminated soil and groundwater at and near the Everett site. Id. at 296.

Century reserved its rights, and in 2002 Boston Gas filed a diversity action in federal court against Century, seeking a declaratory judgment regarding Century's obligations under the insurance policies, and damages for Century's breach of the policies. Ibid. A jury found Century liable, and it awarded Boston Gas over $6.2 million in damages for the costs it incurred in the investigation and cleanup of the environmental contamination at the Everett site. Ibid. In the ensuing appeal, the First Circuit referred to the SJC the various allocation issues under Massachusetts law we quoted above.

After detailing the history of the case, the SJC noted in Boston Gas I that, "[t]he issue that remained was whether and how those damages were to be allocated among the various insurers whose policies had been triggered by the environmental contamination at the Everett site." Id. at 297.

10

The SJC explained that "[t]he first certified question [from the First Circuit] requires us to decide how to allocate liability for long-term environmental contamination where a policyholder sues one of its CGL insurers that provided coverage for the risk (was 'on the risk') for only a portion of the time during which the contamination took place." Ibid. The SJC noted that "[t]his allocation issue commonly arises in the context of insurance disputes involving so-called 'long-tail claims,'" ibid., which are those that can "occur many years after the triggering event and the expiration of the insurance policy." Ibid. n.16 (quoting In re Liquidation of Am. Mut. Liab. Ins. Co., 747 N.E.2d 1215, 1229 (2001)).

Focusing on the scope of coverage that the triggered CGL policies must provide in such cases involving a "long-tail" claim, the SJC observed:

> Courts in other jurisdictions have struggled to define the scope of coverage where successive CGL policies are triggered by long-tail claims for injuries which take place over many years and are caused by environmental damage or toxic exposure. In most of these cases, "it is both scientifically and administratively impossible to allocate to each policy the liability for injuries occurring only within its policy period." Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L. Rev. 257, 257-258 (1997). See 15 G. Couch[,] § 220:25, at 220-26 (3d ed. 2005) (with respect to "environmental damage and toxic exposure cases . . . it is virtually impossible to allocate to each policy the liability for

injuries occurring only within its policy period").
"When it is impossible to determine the proportion of
damage that occurred within each period, the law must
allocate damages among the policies." Comment at
258. Thus, "the courts are left with the nettlesome
problem of how to allocate damages among the
policies." 15 G. Couch[, § 220:25, at 220-26].

[Id. at 301 (emphasis added).]

The SJC noted the case presented it with an opportunity to consider the

comparative merits of "pro rata" versus "joint and several" allocation. Id. at

304. After discussing and considering both methods, the SJC determined that

"a pro rata allocation of losses is consistent with, if not compelled by, the most

reasonable construction of the policies at issue." Id. at 306. "[T]he pro rata

allocation produces a more equitable result," and "promotes judicial efficiency,

engenders stability and predictability in the insurance market, [and] provides

incentive for responsible commercial behavior, and produces an equitable

result." Id. at 311.

In describing the pro rata method of allocation, the SJC explained:

The pro rata "approach emphasizes that part of a long-
tail injury will occur outside any particular policy
period. Rather than requiring any one policy to cover
the entire long-tail loss, [pro rata] allocation instead
attempts to produce equity across time." "One
important feature of a pro rata allocation is that courts
adopting this type of allocation generally require the
policyholder to participate in the allocation . . . for

12

those periods of no insurance, self-insurance, or insufficient insurance."

[Id. at 303 (alteration in original) (citations omitted).]

Addressing the second certified question in Boston Gas I, the SJC observed it was required to determine the appropriate method or formula for allocating damages on a pro rata basis. Id. at 312. The SJC declared that the "ideal method" is a "fact-based" allocation,

> under which courts would "determine precisely what injury or damage took place during each contract period or uninsured period and allocate the loss accordingly." "Although such an allocation is the most consistent with the contract language, the inability to make such determinations or the litigation costs associated with such an exact allocation has caused courts to use various proxies for deriving fair apportionment."
>
> [Ibid. (citations omitted) (emphasis added).]

Notably for the present case, the SJC instructed that "where it is not feasible to make a fact-based allocation of losses attributable to each policy period, losses should be allocated using the time-on-the-risk method . . . ." Id. at 316 (emphasis added). A time-on-the-risk method's "inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates." Id. at 314 (citation omitted). The SJC further explained:

> Ultimately, the pro rata allocation method that we espouse here addresses a problem of proof. We do not

13

A-3029-22

foreclose the possibility that in some cases the facts may permit a more accurate estimation of how much property damage took place in each period. If the evidence permits an accurate estimation of the quantum of property damage in each policy period then proration by time on the risk may be inappropriate. Given the factual complexities of cases of this sort, we defer to trial judges in the first instance to determine whether losses can be allocated based on the amount of property damage that in fact occurred during each policy period, or must instead be allocated on the basis of each insurer's time on the risk.

[Id. at 316 (emphasis added).]

B.

We now proceed to examine how BASF's allocation expert, the SAM, and the second judge applied these controlling principles from Boston Gas I. Because our examination predominantly concerns issues of law, we review those determinations de novo. The Palisades at Fort Lee Condo. Ass'n, Inc. v. 100 Old Palisade, LLC, 230 N.J. 427, 442 (2017).

In the hearings before the SAM, BASF presented testimony from a hydrologist and hydrogeologist who had investigated the scope of contamination at the Plainville facility when it was first discovered, and who later served as BASF's expert in the liability and allocation cases ("BASF's expert"). As part of his review, BASF's expert attempted to allocate the total environmental damages of $12.8 million established by the first judge among BASF and the

14

three remaining insurers in the case: US Fire, Certain Underwriters at Lloyd's and British Companies ("Underwriters"), and OneBeacon America Insurance Company ("OneBeacon").

BASF's expert acknowledged it was not possible to determine the specific Area of Concern ("AOC") at the Plainville facility from which the CVOCs found in the groundwater originated. However, he believed it was possible to perform "a more fact-based allocation which layers in information about where and when releases occurred on the facility and the relative importance of the individual areas where releases occurred to the overall contamination problem."

The BASF expert began his allocation calculations by considering the following to calculate a weighting factor for each AOC: specific operations conducted at each AOC on the site, the nature of the property damage emanating from each AOC, and the relative contribution of each AOC to the site-wide groundwater problem. The weighting factor reflected the relative contribution of each AOC to the CVOC contamination of the groundwater and thus to the overall cost of operating the groundwater stabilization measures. AOCs that involved direct releases of degreasing solvents to the subsurface, such as AOC #22, were assigned by BASF's expert a higher weighting factor. Those that

15

involved either releases above the water table or indirect releases, such as AOC #7, were assigned a lower weighting factor.

Next, BASF's expert multiplied the covered damages by the weighting factor assigned to each AOC to calculate BASF's total covered costs for each AOC.

Based on the extensive investigation conducted at the Plainville facility, and the findings of the first judge, BASF's expert opined that after the period of operations of each AOC, nothing further was done to add to the contamination originating from that AOC. Thus, BASF's covered damages for each AOC were pro-rated over the period of operations of each AOC, with the result being an allocation of BASF's covered costs to each policy period. The expert testified that he did not intend to allocate BASF's damages to specific policies, so he did not consider the underlying limits. Those other limits contained in the US Fire policy were instead identified and considered by the SAM.

Pursuant to these calculations, BASF's expert opined that $3,514,840.83 of BASF's covered damages should be allocated to US Fire's three-year policy period. After deducting for the underlying limits, the SAM allocated $3,314,840.83 to US Fire.

BASF's expert performed a similar calculation to allocate covered costs incurred after December 31, 2009. His calculations resulted in the allocation to US Fire of 26.2% of those costs. The remainder of BASF's covered costs were allocated to periods when BASF was either covered by insurance companies with which it settled or was uninsured.

With minor adjustments, the SAM adopted BASF's expert's allocation methodology. The SAM noted in his decision that the expert was "eminently credible." In his initial decision adopting most of the SAM's recommendations, the second judge likewise relied upon the expert's calculations.

A critical problem, however, is that BSAF's expert stopped short of performing a policy-period-by-period analysis of the estimated damages caused at each AOC. Instead, the expert used a uniform approach that inherently assumed the harm was evenly caused in all policy periods, rather than attempting to identify for each period the levels of discharge that occurred. The discharge rates can be higher or lower than the average in any particular policy period.

For example, as shown on the expert's spreadsheet exhibit P-404, the expert identified for AOC #16 an operating period of 252 months, spanning from January 1, 1958 through January 1, 1979. The expert determined that US Fire provided coverage for 36 months of that time span (February 26, 1970 to

February 26, 1973), OneBeacon covered 65 months (October 1, 1964 to February 26, 1970), and Underwriters covered 81 months (January 1, 1958 to October 1, 1964), with BASF responsible for an uninsured or excluded (termed by the expert "Uncovered") period of 70 months. Then, the expert simply divided US Fire's 36 months by the total of 252 months to derive a percentage of 14%, with, respectively, Underwriters having 32%, OneBeacon 26%, and Uncovered 28%. The expert multiplied that 14% fraction for US Fire times the $498,804,66 in damages for the 21-year period, yielding a share for US Fire of $71,276.39. Similar computations were made for other AOCs.

The crucial shortcoming of this mode of analysis is that it omits any fact-based consideration that the rates of discharge at a particular AOC can vary from year to year and from policy period to policy period. Hence, the 14% share the expert calculated for US Fire at AOC #16 could be overstated if the rates of discharge for the 1958-1970 and 1973-1979 time frames covered by the other insurers or uninsured were higher than during US Fire's 1970-1973 policy period. And vice versa.

Indeed, the expert acknowledged in his deposition testimony that "there isn't in this data record . . . specific information on how much solvent was released at any one location at any point in time." He also acknowledged that it

A-3029-22

wasn't "scientifically possible . . . to unequivocally pinpoint the specific timing of any CVOC releases that have occurred at the site."

This imprecision, coupled with the generalized assumption of an even flow of discharges during all of the policy periods, fails to comply with the requirements of Boston Gas I. As we have already noted, in order to depart from a time-on-the-risk allocation method, there must be "an accurate estimation of how much property damage took place in each [policy] period." Boston Gas I, 910 N.E. 2d at 316 (emphasis added). The BASF's expert presented no such period-based estimates. Although we do not fault the expert for lacking the data to so, this is manifestly the common situation in which "it is both scientifically and administratively impossible to allocate to each policy period the liability for injuries occurring only within its policy period." Id. at 301.

The SAM did not address this omission in his recommended decision. The second judge did recognize, in his July 2020 opinion, that it was "impossible to determine the timing of the contamination from any one AOC and the relation to property damage." Despite that recognition, it was not until the reconsideration phase that the second judge correctly concluded the expert's analysis fell short of the requirements of Boston Gas I.

To be sure, in granting reconsideration, the second judge focused on the existence of continuing contamination as a basis to set aside the allocation, rather than relying upon the shortcomings we have highlighted above. Even so, it is evident that the second judge's initial adoption of the SAM's allocation ruling, as a matter of Massachusetts law, was "palpably incorrect" and that it was appropriate to grant US Fire's motion. Cummings v. Bahr, 295 N.J. Super. 374, 384-85 (App. Div. 1996). The court acted within its "sound discretion" to change its mind. Lee v. Brown, 232 N.J. 114, 126 (2018). We observe the maxim that appellate courts may affirm judgments based on the law and the facts, even if we choose not to rely on the reasons expressed by the trial court. El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 169 (App. Div. 2005).

Having said this, we do not intend to disparage the positive features of BASF's expert's work on this case, including his intricate "weighting" of the various AOCs located on the site. Nor do we lack appreciation for the late SAM's diligence and insights in presiding over this difficult matter. Nonetheless, the evidence and analyses simply do not comply with the requirements of Boston Gas I to justify deviating from a time-on-the-risk allocation. We therefore affirm the trial court's July 30, 2020 decision granting reconsideration.

C.

Less needs to be said about BASF's claim that the trial court erred in selecting a January 31, 2011 end date for the coverage allocation period. That date was when the first judge issued his liability decision. Although there are some merits to the various alternative end dates suggested, we are satisfied the date selected was reasonable and legally sound.

The chosen end date for allocation is not, as BASF argues, "totally random," but represents the legally consequential point when a judicial declaration of the total damages was first issued. Because BASF had previously advocated that the damages continued through the trial, the court had sufficient reason to apply the doctrine of judicial estoppel against BASF in now seeking an earlier cutoff date. Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606 (App. Div. 2000). Regardless of whether BASF is estopped, the date of the decision from the liability trial mirrors the end date adopted under Massachusetts law in Boston Gas Co. v. Century Indem. Co., 708 F.3d 254, 261 (1st Cir. 2013) ("Boston Gas II"). We discern no persuasive basis to set aside the trial court's end-date determination.

III.

We briefly turn to US Fire's cross-appeal. The cross-appeal focuses on ancillary issues respecting the third judge's award of counsel fees and costs to BASF and his calculation of prejudgment interest. These ancillary issues do not need extended discussion.

We first turn to the counsel fee award. BASF, in its capacity as a policyholder, sought fees under Rule 4:42-9(a)(6) as an exception to the "American rule" that otherwise calls for litigants to bear the expense of their own counsel. BASF reportedly incurred nearly $1.2 million in counsel fees in litigating its coverage claims against US Fire. The trial court awarded BASF approximately one-half of that claimed amount, specifically $511,005.

As a threshold matter, the third judge soundly rejected US Fire's argument that BASF was not "a successful claimant" in the case, as is required by Occhifinto v. Olivo Construction Co., 221 N.J. 443, 450-51 (2015). Although BASF ultimately obtained a monetary recovery that was about one-fifth of the amount it sought, that award nonetheless reflected its success on "significant issue(s)" of liability and allocation after US Fire and its codefendant insurers denied any duty to indemnify BASF. Ibid.

We also decline to set aside the court's computation of the fee award. "[T]he award of counsel fees under Rule 4:42-9(a)(6) involves the exercise of sound discretion by the trial court." Id. at 450; see also Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 619 (2011). "The apportionment of counsel fees is never a precise calculation, never the result of a 'universal' method." Empower Our Neighborhoods v. Guadagno, 453 N.J. Super. 565, 584 (App. Div. 2018) (quoting Herbst v. Ryan, 90 F.3d 1300, 1304 (7th Cir. 1996)). A trial court does not abuse its discretion when it chooses an apportionment method that "combined the level of responsibility of each entity, as well as the time invested in the case, reaching an equitable outcome." Ibid.

Here, we have a distinctive situation involving litigation that spanned two decades and involved a myriad of legal tasks and attorney time entries. The third judge was at a considerable disadvantage in not having presided over the trials before the first judge and the SAM, nor the arguments in the two rounds of proceedings before the second judge. Due to judicial retirements, the third judge did not have a first-hand opportunity to observe the years of advocacy that preceded his involvement. Given the copious amounts of legal work, we do not fault the third judge for not performing a line-by-line review of all the attorney time records.

23

We recognize the third judge utilized a stylized and unique method in calculating the fees, one which combined a consideration of "the time necessary to litigate" the case with other factors. We need not endorse or repudiate that method as a model for future cases. What we can say is that the methodology generated an award that appears to be within the bounds of fairness and does not comprise an abuse of discretion. Occhifinto, 221 N.J. at 450. We see no reason to vacate the award and remand the matter to the trial court for yet another set of proceedings in this marathon case.

Furthermore, the third judge did not misapply his authority in awarding BASF the sum of $88,827 in costs pursuant to Rule 4:42-8(a). The costs were mainly for expert witness fees and deposition costs. Given the magnitude and longevity of this case, the costs awarded were well within the court's discretion.

US Fire also challenges the trial court's award of $1,068,835.87 in prejudgment interest to BASF. This, too, is a matter of discretion under Rule 4:42-11. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009); see also County of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006). "Unless the allowance of prejudgment interest 'represents a manifest denial of justice, an appellate court should not interfere.'" Litton Indus., 200 N.J. at 390 (quoting County of Essex, 186 N.J. at 61).

For the reasons expressed by the third judge in his February 10, 2023 written decision, we are satisfied the court did not misapply its discretion in calibrating interest. The court acted reasonably in choosing the year 1989 as the start date for interest, even though there may be some doubt as to exactly when the underlying excess limits were exhausted. We likewise affirm the trial court's inclusion of the optional 2% interest enhancement allowed under Rule 4:42-11(a)(iii), as an exercise of the court's equitable discretion in this unusually prolonged case. US Fire has had the use of the funds for more than two decades. There is no "manifest denial of justice" demonstrated in the prejudgment interest award.

## IV.

To the extent we have not addressed them explicitly, all other points and sub-points raised on the appeal and cross-appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division